# COLUMBUS BOARD OF EDUCATION ET AL. *v.* PENICK ET AL.

No. 78-610.   Argued April 24, 1979—Decided July 2, 1979

450

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BURGER, C. J., filed an opinion concurring in the judgment, *post,* p. 468. STEWART, J., filed an opinion concurring in the judgment, in which BURGER, C. J., joined, *post,* p. 469. POWELL, J., filed a dissenting opinion, *post,* p. 479. REHNQUIST, J., filed a dissenting opinion, in which POWELL, J., joined, *post,* p. 489.

*Samuel H. Porter* argued the cause for petitioners. With him on the briefs were *Earl F. Morris* and *Curtis A. Loveland.*

*Thomas I. Atkins* argued the cause for respondents. With him on the brief were *Richard M. Stein, William L. Taylor, Nathaniel R. Jones, Louis R. Lucas, William E. Caldwell, Paul R. Dimond, Robert A. Murphy, Richard S. Kohn,* and *Norman J. Chachkin. Mark O'Neill* filed a brief for the Ohio State Board of Education et al. as respondents under this Court's Rule 21 (4).

*Assistant Attorney General Days* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Wallace, Sara Sun Beale, Brian K. Landsberg,* and *Robert J. Reinstein.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed by *Richard S. Gebelein,* Attorney General of Delaware, *Regina M. Small,* Deputy Attorney General, *Mason E. Turner, Jr., James T. McKinstry,* and *Philip B. Kurland* for the Delaware State Board of Education et al.; and by *Charles E. Brown* and *Ira Owen Kane* for the Neighborhood School Coordinating Committee et al.

Briefs of *amici curiae* urging affirmance were filed by *Burt Neuborne, E. Richard Larson, Robert Allen Sedler, Winn Newman,* and *Carole W. Wilson* for the American Civil Liberties Union et al.; by *Arthur J. Lesemann* for the Fair Housing Council of Bergen County, N. J.; by *Jack Greenberg, James M. Nabrit III, Bill Lann Lee, Joseph L. Rauh, Jr., John Silard, Elliott C. Lichtman,* and *John Fillion* for the NAACP Legal Defense and Educational Fund, Inc., et al.; and by *Stephen J. Pollak, Richard M. Sharp, Wendy S. White,* and *David Rubin* for the National Education Association et al.

Briefs of *amici curiae* were filed by *Harriet F. Pilpel, Nathan Z. Dershowitz,* and *Joseph B. Robison* for the American Jewish Congress; and by *Duane W. Krohnke* for Special School District No. 1, Minneapolis, Minn.

Mr. Justice White delivered the opinion of the Court.

The public schools of Columbus, Ohio, are highly segregated by race. In 1976, over 32% of the 96,000 students in the system were black. About 70% of all students attended schools that were at least 80% black or 80% white. 429 F. Supp. 229, 240 (SD Ohio 1977). Half of the 172 schools were 90% black or 90% white. 583 F. 2d 787, 800 (CA6 1978). Fourteen named students in the Columbus school system brought this case on June 21, 1973, against the Columbus Board of Education, the State Board of Education, and the appropriate local and state officials.[1] The second amended complaint, filed on October 22, 1974, charged that the Columbus defendants had pursued and were pursuing a course of conduct having the purpose and effect of causing and perpetuating segregation in the public schools, contrary to the Fourteenth Amendment. A declaratory judgment to this effect and appropriate injunctive relief were prayed. Trial of the case began more than a year later, consumed 36 trial days, produced a record containing over 600 exhibits and a transcript in excess of 6,600 pages, and was completed in June 1976. Final arguments were heard in September, and in March 1977 the District Court filed an opinion and order containing its findings of fact and conclusions of law. 429 F. Supp. 229.

The trial court summarized its findings:

"From the evidence adduced at trial, the Court has found earlier in this opinion that the Columbus Public Schools were openly and intentionally segregated on the basis of race when *Brown* [v. *Board of Education,* 347 U. S. 483 *(Brown I)*] was decided in 1954. The Court has found that the Columbus Board of Education never actively set out to dismantle this dual system. The Court has found that until legal action was initiated by the

---

[1] A similar group of plaintiffs was allowed to intervene, and the original plaintiffs were allowed to file an amended complaint that was certified as a class action. 429 F. Supp. 229, 233–234 (SD Ohio 1977); App. 50.

Columbus Area Civil Rights Council, the Columbus Board did not assign teachers and administrators to Columbus schools at random, without regard for the racial composition of the student enrollment at those schools. The Columbus Board even in very recent times . . . has approved optional attendance zones, discontiguous attendance areas and boundary changes which have maintained and enhanced racial imbalance in the Columbus Public Schools. The Board, even in very recent times and after promising to do otherwise, has adjured [sic] workable suggestions for improving the racial balance of city schools.

"Viewed in the context of segregative optional attendance zones, segregative faculty and administrative hiring and assignments, and the other such actions and decisions of the Columbus Board of Education in recent and remote history, it is fair and reasonable to draw an inference of segregative intent from the Board's actions and omissions discussed in this opinion." Id., at 260–261.

The District Court's ultimate conclusion was that at the time of trial the racial segregation in the Columbus school system "directly resulted from [the Board's] intentional segregative acts and omissions," id., at 259, in violation of the Equal Protection Clause of the Fourteenth Amendment. Accordingly, judgment was entered against the local and state defendants enjoining them from continuing to discriminate on the basis of race in operating the Columbus public schools and ordering the submission of a systemwide desegregation plan.

Following decision by this Court in Dayton Board of Education v. Brinkman, 433 U. S. 406 (Dayton I), in June 1977, and in response to a motion by the Columbus Board, the District Court rejected the argument that Dayton I required or permitted any modification of its findings or judgment. It reiterated its conclusion that the Board's " 'liability in this case concerns the Columbus School District as a whole,' " App. to Pet. for Cert. 94, quoting 429 F. Supp., at 266, asserting that,

although it had "no real interest in any remedy plan which is more sweeping than necessary to correct the constitutional wrongs plaintiffs have suffered," neither would it accept any plan "which fails to take into account the systemwide nature of the liability of the defendants." App. to Pet. for Cert. 95. The Board subsequently presented a plan that complied with the District Court's guidelines and that was embodied in a judgment entered on October 7. The plan was stayed pending appeal to the Court of Appeals.

Based on its own examination of the extensive record, the Court of Appeals affirmed the judgments entered against the local defendants.[2] 583 F. 2d 787. The Court of Appeals could not find the District Court's findings of fact clearly erroneous. *Id.*, at 789. Indeed, the Court of Appeals examined in detail each set of findings by the District Court and found strong support for them in the record. *Id.*, at 798, 804, 805, 814. The Court of Appeals also discussed in detail and found unexceptionable the District Court's understanding and application of the Fourteenth Amendment and the cases construing it.

Implementation of the desegregation plan was stayed pending our disposition of the case. 439 U. S. 1348 (1978) (REHNQUIST, J., in chambers). We granted the Board's petition for certiorari, 439 U. S. 1066 (1979), and we now affirm the judgment of the Court of Appeals.

I

The Board earnestly contends that when this case was brought and at the time of trial its operation of a segregated school system was not done with any general or specific racially discriminatory purpose, and that whatever unconsti-

---

[2] The Court of Appeals vacated the judgment against the state defendants and remanded for further proceedings regarding those parties. 583 F. 2d 787, 815–818 (CA6 1978). No issue with respect to the state defendants is before us now.

tutional conduct it may have been guilty of in the past such conduct at no time had systemwide segregative impact and surely no remaining systemwide impact at the time of trial. A systemwide remedy was therefore contrary to the teachings of the cases, such as *Dayton I*, that the scope of the constitutional violation measures the scope of the remedy.[3]

We have discovered no reason, however, to disturb the judgment of the Court of Appeals, based on the findings and conclusions of the District Court, that the Board's conduct at the time of trial and before not only was animated by an unconstitutional, segregative purpose, but also had current, segregative impact that was sufficiently systemwide to warrant the remedy ordered by the District Court.

These ultimate conclusions were rooted in a series of constitutional violations that the District Court found the Board to have committed and that together dictated its judgment and decree. In each instance, the Court of Appeals found the District Court's conclusions to be factually and legally sound.

## A

First, although at least since 1888 there had been no statutory requirement or authorization to operate segregated schools,[4] the District Court found that in 1954, when *Brown* v.

---

[3] Petitioners also argue that the District Court erred in requiring that every school in the system be brought roughly within proportionate racial balance. We see no misuse of mathematical ratios under our decision in *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 22–25 (1971), especially in light of the Board's failure to justify the continued existence of "some schools that are all or predominantly of one race . . . ." *Id.,* at 26; see App. to Pet. for Cert. 102–103. Petitioners do not otherwise question the remedy if a systemwide violation was properly found.

[4] In 1871, pursuant to the requirements of state law, Columbus maintained a complete separation of the races in the public schools. 429 F. Supp., at 234–235. The Ohio Supreme Court ruled in 1888 that state law no longer required or permitted the segregation of schoolchildren. *Board of Education* v. *State,* 45 Ohio St. 555, 16 N. E. 373. Even prior to that, in 1881, the Columbus Board abolished its separate schools for

*Board of Education,* 347 U. S. 483 (*Brown I*), was decided, the Columbus Board was not operating a racially neutral, unitary school system, but was conducting "an enclave of separate, black schools on the near east side of Columbus," and that "[t]he then-existing racial separation was the direct result of cognitive acts or omissions of those school board members and administrators who had originally intentionally caused and later perpetuated the racial isolation . . . ." 429 F. Supp., at 236. Such separateness could not "be said to have been the result of racially neutral official acts." *Ibid.*

Based on its own examination of the record, the Court of Appeals agreed with the District Court in this respect, observing that, "[w]hile the Columbus school system's dual black-white character was not mandated by state law as of 1954, the record certainly shows intentional segregation by the Columbus Board. As of 1954 the Columbus School Board had 'carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers and facilities within the school system.'" 583 F. 2d, at 798–799, quoting *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189, 201–202 (1973).

The Board insists that, since segregated schooling was not commanded by state law and since not all schools were wholly black or wholly white in 1954, the District Court was not war-

---

black and white students, but by the end of the first decade of this century it had returned to a segregated school policy. Champion Avenue School was built in 1909 in a predominantly black area and was completely staffed with black teachers. Other black schools were established as the black population grew. The Board gerrymandered attendance zones so that white students who lived near these schools were assigned to or could attend white schools, which often were further from their homes. By 1943, a total of five schools had almost exclusively black student bodies, and each was assigned an all-black faculty, often through all-white to all-black faculty transfers that occurred each time the Board came to consider a particular school as a black school. 429 F. Supp., at 234–236.

ranted in finding a dual system.[5]   But the District Court found that the "Columbus Public Schools were *officially* segregated by race in 1954," App. to Pet. for Cert. 94 (emphasis added); [6] and in any event, there is no reason to question the finding that as the "direct result of cognitive acts or omissions" the

[5] Both our dissenting Brethren and the separate concurrence of MR. JUSTICE STEWART put great weight on the absence of a statutory mandate or authorization to discriminate, but the Equal Protection Clause was aimed at all official actions, not just those of state legislatures.   "[N]o agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws.   Whoever, by virtue of public position under a State government, . . . denies or takes away the equal protection of the laws . . . violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State."   *Ex parte Virginia,* 100 U. S. 339, 347 (1880).   Thus, in *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886), the discriminatory application of an ordinance fair on its face was found to be unconstitutional state action.   Even actions of state agents that may be illegal under state law are attributable to the State.   *United States* v. *Price,* 383 U. S. 787 (1966); *Screws* v. *United States,* 325 U. S. 91 (1945).   Our decision in *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189 (1973), plainly demonstrates in the educational context that there is no magical difference between segregated schools mandated by statute and those that result from local segregative acts and policies.   The presence of a statute or ordinance commanding separation of the races would ease the plaintiff's problems of proof, but here the District Court found that the local officials, by their conduct and policies, had maintained a dual school system in violation of the Fourteenth Amendment.   The Court of Appeals agreed, and we fail to see why there should be a lesser constitutional duty to eliminate that system than there would have been had the system been ordained by law.

[6] The dissenters in this case claim a better grasp of the historical and ultimate facts than the two courts below had.   But on the issue of whether there was a dual school system in Columbus, Ohio, in 1954, on the record before us we are much more impressed by the views of the judges who have lived with the case over the years.   Also, our dissenting Brothers' suggestion that this Court should play a special oversight role in reviewing the factual determinations of the lower courts in school desegregation cases, *post,* at 491–492 (REHNQUIST, J., dissenting), asserts an omnipotence and omniscience that we do not have and should not claim.

Board maintained "an enclave of separate, black schools on the near east side of Columbus." 429 F. Supp., at 236. Proof of purposeful and effective maintenance of a body of separate black schools in a substantial part of the system itself is prima facie proof of a dual school system and supports a finding to this effect absent sufficient contrary proof by the Board, which was not forthcoming in this case. *Keyes, supra,* at 203.[7]

## B

Second, both courts below declared that since the decision in *Brown* v. *Board of Education,* 349 U. S. 294 (1955) (*Brown II*), the Columbus Board has been under a continuous constitutional obligation to disestablish its dual school system and that it has failed to discharge this duty. App. to Pet. for Cert. 94; 583 F. 2d, at 799. Under the Fourteenth Amendment and the cases that have construed it, the Board's duty to dismantle its dual system cannot be gainsaid.

Where a racially discriminatory school system has been found to exist, *Brown II* imposes the duty on local school boards to "effectuate a transition to a racially nondiscriminatory school system." 349 U. S., at 301. *"Brown II* was a call for the dismantling of well-entrenched dual systems," and school boards operating such systems were "clearly charged

---

[7] It is argued that *Dayton I,* 433 U. S. 406 (1977), implicitly overruled or limited those portions of *Keyes* and *Swann* approving, in certain circumstances, inferences of general, systemwide purpose and current, systemwide impact from evidence of discriminatory purpose that has resulted in substantial current segregation, and approving a systemwide remedy absent a showing by the defendant of what part of the current imbalance was not caused by the constitutional breach. *Dayton I* does not purport to disturb any aspect of *Keyes* and *Swann;* indeed, it cites both cases with approval. On the facts found by the District Court and affirmed by the Court of Appeals at the time *Dayton* first came before us, there were only isolated instances of intentional segregation, which were insufficient to give rise to an inference of systemwide institutional purpose and which did not add up to a facially substantial systemwide impact. *Dayton Board of Education* v. *Brinkman* (*Dayton II*), *post,* at 531, and n. 5.

with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green* v. *County School Board,* 391 U. S. 430, 437–438 (1968). Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment. *Dayton I,* 433 U. S., at 413–414; *Wright* v. *Council of City of Emporia,* 407 U. S. 451, 460 (1972); *United States* v. *Scotland Neck Board of Education,* 407 U. S. 484 (1972) (creation of a new school district in a city that had operated a dual school system but was not yet the subject of court-ordered desegregation).

The *Green* case itself was decided 13 years after *Brown II.* The core of the holding was that the school board involved had not done enough to eradicate the lingering consequences of the dual school system that it had been operating at the time *Brown I* was decided. Even though a freedom-of-choice plan had been adopted, the school system remained essentially a segregated system, with many all-black and many all-white schools. The board's continuing obligation, which had not been satisfied, was " 'to come forward with a plan that promises realistically to work . . . *now* . . . until it is clear that state-imposed segregation has been completely removed.' " *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 13 (1971), quoting *Green, supra,* at 439 (emphasis in original).

As THE CHIEF JUSTICE's opinion for a unanimous Court in *Swann* recognized, *Brown* and *Green* imposed an affirmative duty to desegregate. "If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. . . . In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system." 402 U. S., at 15–16. In *Swann,* it should be recalled, an initial desegregation plan had been entered in 1965 and had been affirmed on appeal. But the case was reopened, and in 1969 the school board was required to come

forth with a more effective plan. The judgment adopting the ultimate plan was affirmed here in 1971, 16 years after *Brown II.*

In determining whether a dual school system has been disestablished, *Swann* also mandates that matters aside from student assignments must be considered:

> "[W]here it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." 402 U. S., at 18.

Further, *Swann* stated that in devising remedies for legally imposed segregation the responsibility of the local authorities and district courts is to ensure that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual school system. *Id.,* at 20–21. As for student assignments, the Court said:

> "No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory." *Id.,* at 26.

The Board's continuing "affirmative duty to disestablish the dual school system" is therefore beyond question, *McDaniel*

v. *Barresi*, 402 U. S. 39, 41 (1971), and it has pointed to nothing in the record persuading us that at the time of trial the dual school system and its effects had been disestablished. The Board does not appear to challenge the finding of the District Court that at the time of trial most blacks were still going to black schools and most whites to white schools. Whatever the Board's current purpose with respect to racially separate education might be, it knowingly continued its failure to eliminate the consequences of its past intentionally segregative policies. The Board "never actively set out to dismantle this dual system." 429 F. Supp., at 260.

## C

Third, the District Court not only found that the Board had breached its constitutional duty by failing effectively to eliminate the continuing consequences of its intentional systemwide segregation in 1954, but also found that in the intervening years there had been a series of Board actions and practices that could not "reasonably be explained without reference to racial concerns," *id.*, at 241, and that "intentionally aggravated, rather than alleviated," racial separation in the schools. App. to Pet. for Cert. 94. These matters included the general practice of assigning black teachers only to those schools with substantial black student populations, a practice that was terminated only in 1974 as the result of a conciliation agreement with the Ohio Civil Rights Commission; the intentionally segregative use of optional attendance zones,[8] discon-

[8] Despite petitioners' avowedly strong preference for neighborhood schools, in times of residential racial transition the Board created optional attendance zones to allow white students to avoid predominantly black schools, which were often closer to the homes of the white pupils. For example, until well after the time the complaint was filed, petitioners allowed students in "a small, white enclave on Columbus' predominantly black near-east side . . . to escape attendance at black" schools. 429 F. Supp., at 244. The court could perceive no racially neutral reasons for this optional zone. *Id.*, at 245. "Quite frankly, the Near-Bexley Option

tiguous attendance areas,[9] and boundary changes;[10] and the selection of sites for new school construction that had the foreseeable and anticipated effect of maintaining the racial separation of the schools.[11] The court generally noted that

appears to this Court to be a classic example of a segregative device designed to permit white students to escape attendance at predominantly black schools." *Ibid.*

[9] This technique was applied when neighborhood schools would have tended to desegregate the involved schools. In the 1960's, a group of white students were bused past their neighborhood school to a "whiter" school. The District Court could "discern no other explanation than a racial one for the existence of the Moler discontiguous attendance area for the period 1963 through 1969." *Id.,* at 247. From 1957 until 1963, students living in a predominantly white area near Heimandale Elementary School attended a more remote, but identifiably white school. *Id.,* at 247-248.

[10] Gerrymandering of boundary lines also continued after 1954. The District Court found, for instance, that for one area on the west side of the city containing three white schools and one black school the Board had altered the lines so that white residential areas were removed from the black school's zone and black students were contained within that zone. *Id.,* at 245-247. The Court found that the segregative choice of lines was not justified "as a matter of academic administration" and "had a substantial and continuing segregative impact upon these four west side schools." *Id.,* at 247.

Another example involved the former Mifflin district that had been absorbed into the Columbus district. The Board staff presented two alternative means of drawing necessary attendance zones: one that was desegregative and one that was segregative. The Board chose the segregative option, and the District Court was unpersuaded that it had any legitimate educational reasons for doing so. *Id.,* at 248-250.

[11] The District Court found that, of the 103 schools built by the Board between 1950 and 1975, 87 opened with racially identifiable student bodies and 71 remained that way at the time of trial. This result was reasonably foreseeable under the circumstances in light of the sites selected, and the Board was often specifically warned that it was, without apparent justification, choosing sites that would maintain or further segregation. *Id.,* at 241-243. As the Court of Appeals noted:

"[T]his record actually requires no reliance upon inference, since, as indicated above, it contains repeated instances where the Columbus Board was

"[s]ince the 1954 *Brown* decision, the Columbus defendants or their predecessors were adequately put on notice of the fact that action was required to correct and to prevent the increase in" segregation, yet failed to heed their duty to alleviate racial separation in the schools. 429 F. Supp., at 255.[12]

## II

Against this background, we cannot fault the conclusion of the District Court and the Court of Appeals that at the time of trial there was systemwide segregation in the Columbus schools that was the result of recent and remote intention-

warned of the segregative effect of proposed site choices, and was urged to consider alternatives which could have had an integrative effect. In these instances the Columbus Board chose the segregative sites. In this situation the District Judge was justified in relying in part on the history of the Columbus Board's site choices and construction program in finding deliberate and unconstitutional systemwide segregation." 583 F. 2d, at 804.

[12] Local community and civil rights groups, the "Ohio State University Advisory Commission on Problems Facing the Columbus Public Schools, and officials of the Ohio State Board of Education all called attention to the problem [of segregation] and made certain curative recommendations." 429 F. Supp., at 255. This was particularly important because the Columbus system grew rapidly in terms of geography and number of students, creating many crossroads where the Board could either turn toward segregation or away from it. See *id.*, at 243. Specifically, for example, the University Commission in 1968 made certain recommendations that it thought not only would assist desegregation of the schools but also would encourage integrated residential patterns. *Id.*, at 256. The Board itself came to similar conclusions about what could be done, but its response was "minimal." *Ibid.* See also *id.*, at 264. Additionally, the Board refused to create a site-selection advisory group to assist in avoiding sites with a segregative effect, refused to ask state education officials to present plans for desegregating the Columbus public schools, and refused to apply for federal desegregation-assistance funds. *Id.*, at 257; see *id.*, at 239. The District Court drew "the inference of segregative intent from the Columbus defendants' failures, after notice, to consider predictable racial consequences of their acts and omissions when alternatives were available which would have eliminated or lessened racial imbalance." *Id.*, at 240.

ally segregative actions of the Columbus Board. While appearing not to challenge most of the subsidiary findings of historical fact, Tr. of Oral Arg. 7, petitioners dispute many of the factual inferences drawn from these facts by the two courts below. On this record, however, there is no apparent reason to disturb the factual findings and conclusions entered by the District Court and strongly affirmed by the Court of Appeals after its own examination of the record.

Nor do we discern that the judgments entered below rested on any misapprehension of the controlling law. It is urged that the courts below failed to heed the requirements of *Keyes, Washington* v. *Davis,* 426 U. S. 229 (1976), and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252 (1977), that a plaintiff seeking to make out an equal protection violation on the basis of racial discrimination must show purpose. Both courts, it is argued, considered the requirement satisfied if it were shown that disparate impact would be the natural and foreseeable consequence of the practices and policies of the Board, which, it is said, is nothing more than equating impact with intent, contrary to the controlling precedent.

The District Court, however, was amply cognizant of the controlling cases. It is understood that to prevail the plaintiffs were required to " 'prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action,' " 429 F. Supp., at 251, quoting *Keyes,* 413 U. S., at 198—that is, that the school officials had "intended to segregate." 429 F. Supp., at 254. See also 583 F. 2d, at 801. The District Court also recognized that under those cases disparate impact and foreseeable consequences, without more, do not establish a constitutional violation. See, *e. g.,* 429 F. Supp., at 251. Nevertheless, the District Court correctly noted that actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose. Those cases do not forbid "the foreseeable

effects standard from being utilized as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn." *Id.*, at 255. Adherence to a particular policy or practice, "with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn." *Ibid.* The District Court thus stayed well within the requirements of *Washington* v. *Davis* and *Arlington Heights.* See *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U. S. 256, 279 n. 25 (1979).

It is also urged that the District Court and the Court of Appeals failed to observe the requirements of our recent decision in *Dayton I,* which reiterated the accepted rule that the remedy imposed by a court of equity should be commensurate with the violation ascertained, and held that the remedy for the violations that had then been established in that case should be aimed at rectifying the "incremental segregative effect" of the discriminatory acts identified.[13]  In *Dayton I,* only a few apparently isolated discriminatory practices had

---

[13] Petitioners have indicated that a few of the recent violations specifically discussed by the District Court involved so few students and lasted for such a short time that they are unlikely to have any current impact. But that contention says little or nothing about the incremental impact of systemwide practices extending over many years. Petitioners also argue that because many of the involved schools were in areas that had become predominantly black residential areas by the time of trial, the racial separation in the schools would have occurred even without the unlawful conduct of petitioners. But, as the District Court found, petitioners' evidence in this respect was insufficient to counter respondents' proof. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 271 n. 21 (1977); *Mt. Healthy City Bd. of Education* v. *Doyle,* 429 U. S. 274, 287 (1977). And the phenomenon described by petitioners seems only to confirm, not disprove, the evidence accepted by the District Court that school segregation is a contributing cause of housing segregation. 429 F. Supp., at 259; see *Keyes,* 413 U. S., at 202–203; *Swann,* 402 U. S., at 20–21.

been found; [14] yet a systemwide remedy had been imposed without proof of a systemwide impact. Here, however, the District Court repeatedly emphasized that it had found purposefully segregative practices with current, systemwide impact.[15] 429 F. Supp., at 252, 259–260, 264, 266; App. to Pet. for Cert. 95; 583 F. 2d, at 799.[16] And the Court of Appeals, responding to similar arguments, said:

"School board policies of systemwide application neces-

[14] Although the District Court in this case discussed in its major opinion a number of specific instances of purposeful segregation, it made it quite clear that its broad findings were not limited to those instances: "Viewing the Court's March 8 findings in their totality, this case does not rest on three specific violations, or eleven, or any other specific number. It concerns a school board which since 1954 has by its official acts intentionally aggravated, rather than alleviated, the racial imbalance of the public schools it administers. These were not the facts of the Dayton case." App. to Pet. for Cert. 94.

[15] MR. JUSTICE REHNQUIST's dissent erroneously states that we have "reliev[ed] school desegregation plaintiffs from any showing of a causal nexus between intentional segregative actions and the conditions they seek to remedy." *Post*, at 501. As we have expressly noted, both the District Court and the Court of Appeals found that the Board's purposefully discriminatory conduct and policies had current, systemwide impact—an essential predicate, as both courts recognized, for a systemwide remedy. Those courts reveal a much more knowledgeable and reliable view of the facts and of the record than do our dissenting Brethren.

[16] "For example, there is little dispute that Champion, Felton, Mt. Vernon, Pilgrim and Garfield were de jure segregated by direct acts of the Columbus defendants' predecessors. They were almost completely segregated in 1954, 1964, 1974 and today. Nothing has occurred to substantially alleviate that continuity of discrimination of thousands of black students over the intervening decades." 429 F. Supp., at 260 (footnote omitted).

"The finding of liability in this case concerns the Columbus school district as a whole. Actions and omissions by public officials which tend to make black schools blacker necessarily have the reciprocal effect of making white schools whiter. '[I]t is obvious that a practice of concentrating Negroes in certain schools by structuring attendance zones or designating "feeder" schools on the basis of race has the reciprocal effect of keeping

sarily have systemwide impact. 1) The pre-1954 policy of creating an enclave of five schools intentionally designed for black students and known as 'black' schools, as found by the District Judge, clearly had a 'substantial'—indeed, a systemwide—impact. 2) The post-1954 failure of the Columbus Board to desegregate the school system in spite of many requests and demands to do so, of course, had systemwide impact. 3) So, too, did the Columbus Board's segregative school construction and siting policy as we have detailed it above. 4) So too did its student assignment policy which, as shown above, produced the large majority of racially identifiable schools as of the school year 1975–76. 5) The practice of assigning black teachers and administrators only or in large majority to black schools likewise represented a systemwide policy of segregation. This policy served until July 1974 to deprive black students of opportunities for contact with and learning from white teachers, and conversely to deprive white students of similar opportunities to meet, know and learn from black teachers. It also served as discriminatory, systemwide racial identification of schools." 583 F. 2d, at 814.

Nor do we perceive any misuse of *Keyes,* where we held that purposeful discrimination in a substantial part of a school system furnishes a sufficient basis for an inferential finding of a systemwide discriminatory intent unless otherwise rebutted, and that given the purpose to operate a dual school system one could infer a connection between such a purpose and racial

other nearby schools predominantly white.' *Keyes*[, *supra,* at 201]. The evidence in this case and the factual determinations made earlier in this opinion support the finding that those elementary, junior, and senior high schools in the Columbus school district which presently have a predominantly black student enrollment have been substantially and directly affected by the intentional acts and omissions of the defendant local and state school boards." *Id.,* at 266.

separation in other parts of the school system. There was no undue reliance here on the inferences permitted by *Keyes,* or upon those recognized by *Swann.* Furthermore, the Board was given ample opportunity to counter the evidence of segregative purpose and current, systemwide impact, and the findings of the courts below were against it in both respects. 429 F. Supp., at 260; App. to Pet. for Cert. 95, 102, 105.

Because the District Court and the Court of Appeals committed no prejudicial errors of fact or law, the judgment appealed from must be affirmed.

*So ordered.*

Mr. Chief Justice Burger, concurring in the judgment.

I perceive no real difference in the legal principles stated in the dissenting opinions of Mr. Justice Rehnquist and Mr. Justice Powell on the one hand and the opinion of Mr. Justice Stewart concurring in the result in this case on the other; they differ only in their view of the District Court's role in applying these principles in the finding of facts.

Like Mr. Justice Rehnquist, I have serious doubts as to how many of the post-1954 actions of the Columbus Board of Education can properly be characterized as segregative in intent and effect. On this record I might very well have concluded that few of them were. However, like Mr. Justice Stewart, I am prepared to defer to the trier of fact because I find it difficult to hold that the errors rise to the level of "clearly erroneous" under Rule 52. The District Court did find facts sufficient to justify the conclusion reached by Mr. Justice Stewart that the school "district was not being operated in a racially neutral manner" and that the Board's actions affected "a meaningful portion" of the school system. *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189, 208 (1973). For these reasons I join Mr. Justice Stewart's opinion.

In joining that opinion, I must note that I agree with much

that is said by JUSTICES REHNQUIST and POWELL in their dissenting opinions in this case and in *Dayton Board of Education* v. *Brinkman, post,* p. 526. I agree especially with that portion of MR. JUSTICE REHNQUIST's opinion that criticizes the Court's reliance on the finding that both Columbus and Dayton operated "dual school systems" at the time of *Brown* v. *Board of Education,* 347 U. S. 483 (1954), as a basis for holding that these school boards have labored under an unknown and unforeseeable affirmative duty to desegregate their schools for the past 25 years. Nothing in reason or our previous decisions provides foundation for this novel legal standard.

I also agree with many of the concerns expressed by MR. JUSTICE POWELL with regard to the use of massive transportation as a "remedy." It is becoming increasingly doubtful that massive public transportation really accomplishes the desirable objectives sought. Nonetheless our prior decisions have sanctioned its use when a constitutional violation of sufficient magnitude has been found. We cannot retry these sensitive and difficult issues in this Court; we can only set the general legal standards and, within the limits of appellate review, see that they are followed.

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE joins, concurring in the result in No. 78–610 and dissenting in No. 78–627, *post,* p. 526.

My views in these cases differ in significant respects from those of the Court, leading me to concur only in the result in the *Columbus* case, and to dissent from the Court's judgment in the *Dayton* case.

It seems to me that the Court of Appeals in both of these cases ignored the crucial role of the federal district courts in school desegregation litigation[1]—a role repeatedly emphasized

---

[1] Federal Rule Civ. Proc. 52 (a) reflects the general deference that is to be paid to the findings of a district court. "Findings of fact shall not

by this Court throughout the course of school desegregation controversies, from *Brown* v. *Board of Education,* 349 U. S. 294 (*Brown II*),[2] to *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406 (*Dayton I*).[3] The development of the law concerning school segregation has not reduced the need for sound factfinding by the district courts, nor lessened the appropriateness of deference to their findings of fact. To the contrary, the elimination of the more conspicuous forms of governmentally ordained racial segregation over the last 25 years counsels undiminished deference to the factual adjudications of the federal trial judges in cases such as these, uniquely situated as those judges are to appraise the societal forces at work in the communities where they sit.

Whether actions that produce racial separation are intentional within the meaning of *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189; *Washington* v. *Davis,* 426 U. S. 229; and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, is an issue that can present very difficult

---

be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." See *United States* v. *United States Gypsum Co.,* 333 U. S. 364, 394–395.

[2] "School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal." *Brown II,* 349 U. S., at 299.

[3] "Indeed, the importance of the judicial administration aspects of the case are heightened by the presence of the substantive issues on which it turns. The proper observance of the division of functions between the federal trial courts and the federal appellate courts is important in every case. It is especially important in a case such as this where the District Court for the Southern District of Ohio was not simply asked to render judgment in accordance with the law of Ohio in favor of one private party against another; it was asked by the plaintiffs, students in the public school system of a large city, to restructure the administration of that system." *Dayton I,* 433 U. S., at 409–410.

and subtle factual questions. Similarly intricate may be factual inquiries into the breadth of any constitutional violation, and hence of any permissible remedy. See *Milliken* v. *Bradley,* 418 U. S. 717 (*Milliken I*); *Dayton I, supra.* Those tasks are difficult enough for a trial judge. The coldness and impersonality of a printed record, containing the only evidence available to an appellate court in any case, can hardly make the answers any clearer. I doubt neither the diligence nor the perseverance of the judges of the courts of appeals, or of my Brethren, but I suspect that it is impossible for a reviewing court factually to know a case from a 6,600-page printed record as well as the trial judge knew it. In assessing the facts in lawsuits like these, therefore, I think appellate courts should accept even more readily than in most cases the factual findings of the courts of first instance.

My second disagreement with the Court in these cases stems from my belief that the Court has attached far too much importance in each case to the question whether there existed a "dual school system" in 1954. As I understand the Court's opinions in these cases, if such an officially authorized segregated school system can be found to have existed in 1954, then any current racial separation in the schools will be presumed to have been caused by acts in violation of the Constitution. Even if, as the Court says, this presumption is rebuttable, the burden is on the school board to rebut it. And, when the factual issues are as elusive as these, who bears the burden of proof can easily determine who prevails in the litigation. *Speiser* v. *Randall,* 357 U. S. 513, 525–526.

I agree that a school district in violation of the Constitution in 1954 was under a duty to remedy that violation. So was a school district violating the Constitution in 1964, and so is one violating the Constitution today. But this duty does not justify a complete shift of the normal burden of proof.[4]

---

[4] In *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189, the Court did discuss the affirmative duty of a school board to desegregate

Presumptions are sometimes justified because in common experience some facts are likely to follow from others. See *Ulster County Court* v. *Allen*, 442 U. S. 140; *Sandstrom* v. *Montana*, 442 U. S. 510. A constitutional violation in 1954 might be presumed to make the existence of a constitutional violation 20 years later more likely than not in one of two ways. First, because the school board then had an invidious intent, the continuing existence of that collective state of mind might be presumed in the absence of proof to the contrary. Second, quite apart from the current intent of the school board, an unconstitutionally discriminatory school system in 1954 might be presumed still to have major effects on the contemporary system. Neither of these possibilities seems to me likely enough to support a valid presumption.

Much has changed in 25 years, in the Nation at large and in Dayton and Columbus in particular. Minds have changed with respect to racial relationships. Perhaps more importantly, generations have changed. The prejudices of the school boards of 1954 (and earlier) cannot realistically be assumed to haunt the school boards of today. Similarly, while two full generations of students have progressed from kindergarten through high school, school systems have changed. Dayton and Columbus are both examples of the dramatic growth and change in urban school districts.[5] It is unrealistic

---

the school district, but limited its discussion to cases "where a dual system was compelled or authorized by statute at the time of our decision in *Brown* v. *Board of Education* . . . ." *Id.*, at 200. It is undisputed that Ohio has forbidden its school boards racially to segregate the public schools since at least 1888. See *Dayton I*, 433 U. S., at 410 n. 4; Ohio Rev. Code Ann. § 3313.48 (Supp. 1978); *Board of Education* v. *State*, 45 Ohio St. 555, 16 N. E. 373; *Clemons* v. *Board of Education*, 228 F. 2d 853, 858.

[5] The Columbus School District grew quickly in the years after 1954. In 1950–1951, the district had 46,352 students. In 1960–1961, over 83,000 students were enrolled. Attendance peaked in 1971–1972 at just over 110,000 students, before sinking to 95,000 at the time of trial. Between

to assume that the hand of 1954 plays any major part in shaping the current school systems in either city. For these reasons, I simply cannot accept the shift in the litigative burden of proof adopted by the Court.

Because of these basic disagreements with the Court's approach, these two cases look quite different to me from the way they look to the Court. In both cases, there is no doubt that many of the districts' children are in schools almost solely with members of their own race. These racially distinct areas make up substantial parts of both districts. The question remains, however, whether the plaintiffs showed that this racial separation was the result of intentional systemwide discrimination.

### The *Dayton* case

After further hearings following the remand by this Court in the first *Dayton* case, the District Court dismissed this lawsuit. It found that the plaintiffs had not proved a discriminatory purpose behind many of the actions challenged. It found further that the plaintiffs had not proved that any significant segregative effect had resulted from those few practices that the school board had previously undertaken with an invalid intent. The Court of Appeals held these findings to be clearly erroneous. I cannot agree.

As to several claimed acts of post-1954 discrimination, the Court of Appeals seems simply to have differed with the trial court's factual assessments, without offering a reasoned explanation of how the trial court's finding fell short.[6] The

---

1950 and 1970, an average of over 100 classrooms a year were added to the district.

Although the Dayton District grew less dramatically, the student population increased from 35,000 in 1950–1951, of whom approximately 6,600 were Negro, to 45,000 at the time of trial, of whom about 22,000 were Negro. Twenty-four new schools were opened in Dayton between 1950 and the time of trial.

[6] For example, the District Court concluded that faculty segregation in

Court of Appeals may have been correct in its assessment of the facts, but that is not demonstrated by its opinion. I would accept the trial judge's findings of fact.

Furthermore, the Court of Appeals relied heavily on the proposition that the Dayton School District was a "dual system" in 1954, and today this Court places great stress on the same foundation. In several instances, the Court of Appeals overturned the District Court's findings of fact because of the trial court's failure to shift the burden of proof.[7] Because I think this shifting of the burden is wholly unjustified, it seems to me a serious mistake to upset the District Court's findings on any such basis. If one accepts the facts as found by the District Judge, there is almost no basis for finding any constitutional violations *after* 1954. Nor is there any substantial

---

the Dayton district ceased by 1963. The Court of Appeals reversed, saying:

"In *Brinkman I, supra,* 503 F. 2d at 697–98, this court found that defendants 'effectively continued in practice the racial assignment of faculty through the 1970–71 school year.' This finding is supported by substantial evidence on the record. The finding of the district court to the contrary is clearly erroneous." (Footnotes omitted.) *Brinkman* v. *Gilligan,* 583 F. 2d 243, 253 (CA6).

[7] Thus, in considering certain optional attendance zones that the District Court found had not been instituted with a discriminatory intent, the Court of Appeals wrote:

"In reaching these clearly erroneous findings of fact, the district court once again failed to recognize the optional zones as a perpetuation, rather than an elimination, of the existing dual system; failed to afford plaintiffs the burden-shifting benefits of their prima facie case; and failed to evaluate the evidence in light of tests for segregative intent enunciated by the Supreme Court, this court and other circuits in decisions cited in this opinion." *Id.,* at 255.

The Court of Appeals opinion relied upon the same theory in overturning the factual conclusions of the District Court that school construction and site selection had not been undertaken with a discriminatory purpose in Dayton. Thus, it is impossible to separate the conclusions of law made by the Court of Appeals from its rulings that the District Court made clearly erroneous findings of fact.

evidence of the continuing impact of pre-1954 discrimination. Only if the defendant school board is saddled with the burdens of proving that it acted out of proper motives after 1954 *and* that factors other than pre-1954 policies led to racial separation in the district's schools, could these plaintiffs possibly prevail.

For the reasons I have expressed, I dissent from the opinion and judgment of the Court.

## The *Columbus* case

In contrast, the Court of Appeals did not upset the District Court's findings of fact in this case. In a long and careful opinion, the District Judge discussed numerous examples of overt racial discrimination continuing into the 1970's.[8]   Just

---

[8] The two clearest cases of discrimination involved attendance zones. The near-Bexley optional zone operated from the 1959–1960 school year through the 1974–1975 school year. This zone encompassed a small area of Columbus between Alum Creek and the town of Bexley. The area west of the creek was predominately Negro; the area covered by the option was predominately white. Students living in that zone were given the option of being bused entirely through the town of Bexley to "white" Columbus schools on its eastern border. The District Court concluded:

"Nothing presented by the Columbus defendants at trial, at closing arguments, or in their briefs convinces the Court that the Near-Bexley Option was created or maintained for racially neutral reasons. The Court finds that the option was not created and maintained because of over-crowding or geographical barriers.

.        .        .        .        .

". . . Quite frankly, the Near-Bexley Option appears to this Court to be a classic example of a segregative device designed to permit white students to escape attendance at predominately black schools." 429 F. Supp. 229, 245 (SD Ohio).

The Moler discontiguous zone affected two elementary schools in the southeastern portion of the school district. A majority of the students in the Alum Crest Elementary School were, at all relevant times, Negro. Through 1969, no more than 8.7% of the students at the other school, Moler Elementary, were Negro. The District Court found:

"Between September, 1966 and June, 1968, about 70 students, most of them white, were bused daily past Alum Crest Elementary from the dis-

as I would defer to the findings of fact made by the District Court in the *Dayton* case, I would accept the trial court's findings in this case.

The Court of Appeals did rely in part on its finding that the Columbus Board operated a dual school system in 1954, as does this Court. But evidence of recent discriminatory intent, so lacking in the *Dayton* case, was relatively strong in this case. The particular illustrations recounted by the District Court may not have affected a large portion of the school district, but they demonstrated that the district was not being operated in a racially neutral manner. The District Court found that the Columbus Board had intentionally discriminated against Negro students in some schools, and that there was substantial racial separation throughout the district. The question in my judgment is whether the District Court's conclusion that there had been a systemwide constitutional violation can be upheld on the basis of those findings, without reference to an affirmative duty stemming from the situation in 1954.

I think the Court's decision in *Keyes* v. *School Dist. No. 1, Denver, Colo.*, 413 U. S. 189, provides the answer:

"[W]e hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case

---

contiguous attendance area to Moler Elementary. The then-principal of Alum Crest watched the bus drive past the Alum Crest building on its way to and from Moler. At the time, the Columbus Board of Education was leasing 11 classrooms at Alum Crest to Franklin County. There was enough classroom space at Alum Crest to accommodate the students who were transported to Moler. When the principal inquired of a Columbus school administrator why this situation existed, he was given no reasonable explanation.

"The Court can discern no other explanation than a racial one for the existence of the Moler discontiguous attendance area for the period 1963 through 1969." *Id.*, at 247.

of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions." *Id.*, at 208.

The plaintiffs in the *Columbus* case, unlike those in the *Dayton* case, proved what the Court in *Keyes* defined as a prima facie case.[9] The District Court and the Court of Appeals correctly found that the school board did not rebut this presumption. It is on this basis that I agree with the District Court and the Court of Appeals in concluding that the Columbus School District was operated in violation of the Constitution.

The petitioners in the *Columbus* case also challenge the remedy imposed by the District Court. Just two Terms ago we set out the test for determining the appropriate scope of a remedy in a case such as this:

"If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the . . . school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy." *Dayton I,* 433 U. S., at 420.

[9] The Denver School District at the time of the trial in *Keyes* had 96,000 students, almost exactly the number of students in the Columbus system at the time of this trial. The Park Hill region of Denver had been the scene of the intentional discrimination that the Court believed justified a presumption of systemwide violation. That region contained six elementary schools and one junior high school, educating a small portion of the school district's students, but a large number of the district's Negro students.

In the context in which the *Columbus* case has reached us, I cannot say that the remedy imposed by the District Court was impermissible under this test. For the reasons discussed above, the District Court's conclusion that there was a systemwide constitutional violation was soundly based. And because the scope of the remedy is tied to the scope of the violation, a remedy encompassing the entire school district was presumptively appropriate. In litigating the question of remedy, however, I think the defendants in a case such as this should always be permitted to show that certain schools or areas were not affected by the constitutional violation.

The District Court in this case did allow the defendants to show just that. The school board proposed several remedies, but it put forward only one plan that was limited by the allegedly limited effects of the violation. That plan would have remedied racial imbalance only in the schools mentioned in the District Court's opinion. Another remedy proposed by the school board would have resulted in a rough racial balance in all but 22 "all-white" schools. But the board did not assert that those schools had been unaffected by the violations. Instead, it justified that plan on the ground that it would bring the predominately Negro schools into balance with no need to involve the 22 all-white schools on the periphery of the district. The District Court rejected this plan, finding that it would not offer effective desegregation since it would leave those 22 schools available for "white flight." The plan ultimately adopted by the District Court used the Negro school population of Columbus as a benchmark, and decreed that all the public schools should be 32% minority, plus or minus 15%.

Although, as the Court stressed in *Green* v. *County School Board,* 391 U. S. 430, a remedy is to be judged by its effectiveness, effectiveness *alone* is not a reason for extending a remedy to all schools in a district. An easily visible correlation between school segregation and residential segregation cannot by

itself justify the blanket extension of a remedy throughout a district. As *Dayton I* made clear, unless a school was affected by the violations, it should not be included in the remedy. I suspect the defendants in *Columbus* might have been able to show that at least some schools in the district were not affected by the proved violations. Schools in the far eastern or northern portions of the district were so far removed from the center of Negro population that the unconstitutional actions of the board may not have affected them at all. But the defendants did not carry the burden necessary to exclude those schools.

The remedy adopted by the District Court used numerical guidelines, but it was not for that reason invalid. As this Court said in *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1:

> "Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court." *Id.,* at 25.

On this record, therefore, I cannot say that the remedy was improper.

For these reasons, I concur in the result in *Columbus Board of Education* v. *Penick,* and dissent in *Dayton Board of Education* v. *Brinkman.*

MR. JUSTICE POWELL, dissenting.*

I join the dissenting opinions of MR. JUSTICE REHNQUIST and write separately to emphasize several points. The Court's opinions in these two cases are profoundly disturbing. They appear to endorse a wholly new constitutional concept applicable to school cases. The opinions also seem remark-

---

*[This opinion applies also to No. 78–627, *Dayton Board of Education et al.* v. *Brinkman et al., post,* p. 526.]

ably insensitive to the now widely accepted view that a quarter of a century after *Brown* v. *Board of Education,* 347 U. S. 483 (1954) (*Brown I*), the federal judiciary should be limiting rather than expanding the extent to which courts are operating the public school systems of our country. In expressing these views, I recognize, of course, that my Brothers who have joined the Court's opinions are motivated by purposes and ideals that few would question. My dissent is based on a conviction that the Court's opinions condone the creation of bad constitutional law and will be even worse for public education—an element of American life that is essential, especially for minority children.

I

Mr. Justice Rehnquist's dissents demonstrate that the Court's decisions mark a break with both precedent and principle. The Court indulges the courts below in their stringing together of a chain of "presumptions," not one of which is close enough to reality to be reasonable. See *ante,* at 472 (opinion of Stewart, J.). This chain leads inexorably to the remarkable conclusion that the absence of integration found to exist in a high percentage of the 241 schools in Columbus and Dayton was caused entirely by intentional violations of the Fourteenth Amendment by the school boards of these two cities. Although this conclusion is tainted on its face, is not supported by evidence in either case, and as a general matter seems incredible, the courts below accepted it as the necessary premise for requiring as a matter of *constitutional law* a systemwide remedy prescribing racial balance in each and every school.

There are unintegrated schools in every major urban area in the country that contains a substantial minority population. This condition results primarily from familiar segregated housing patterns, which—in turn—are caused by social, economic, and demographic forces for which no school board is responsible. These causes of the greater part of the school

segregation problem are not newly discovered. Nearly a decade ago, Professor Bickel wrote:

> "In most of the larger urban areas, demographic conditions are such that no policy that a court can order, and a school board, a city or even a state has the capability to put into effect, will in fact result in the foreseeable future in racially balanced public schools. Only a reordering of the environment involving economic and social policy on the broadest conceivable front might have an appreciable impact." A. Bickel, The Supreme Court and the Idea of Progress 132, and n. 47 (1970).[1]

Federal courts, including this Court today, continue to ignore these indisputable facts. Relying upon fictions and presumptions in school cases that are irreconcilable with principles of equal protection law applied in all other cases, see, *e. g., Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256 (1979); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (1977); *Washington* v. *Davis*, 426 U. S. 229 (1976), federal courts prescribe systemwide remedies without relation to the causes of the segregation found to exist, and implement their decrees by requiring extensive transportation of children of all school ages.

The type of state-enforced segregation that *Brown I* properly condemned no longer exists in this country. This is not to say that school boards—particularly in the great cities of the North, Midwest, and West—are taking all reasonable measures to provide integrated educational opportunities. As I indicated in my separate opinion in *Keyes* v. *School Dist. No. 1, Denver, Colo.*, 413 U. S. 189, 223–236 (1973), *de facto* segregation has existed on a large scale in many of these cities,

---

[1] See also Farley, Residential Segregation and Its Implications for School Integration, 39 Law & Contemp. Prob., No. 1, p. 164 (1975); K. Taeuber & A. Taeuber, Negroes in Cities (1965). The Court of Appeals below treated the residential segregation in Dayton and Columbus as irrelevant. See *post*, at 522, and n. 24 (REHNQUIST, J., dissenting).

and often it is indistinguishable in effect from the type of
*de jure* segregation outlawed by *Brown.* Where there is proof
of intentional segregative action or inaction, the federal courts
must act, but their remedies should not exceed the scope of
the constitutional violation. *Dayton Board of Education* v.
*Brinkman,* 433 U. S. 406 (1977); *Austin Independent School
Dist.* v. *United States,* 429 U. S. 990, 991 (1976) (POWELL, J.,
concurring); *Pasadena City Board of Education* v. *Spangler,*
427 U. S. 424 (1976); *Milliken* v. *Bradley,* 418 U. S. 717
(1974); *Swann* v. *Charlotte-Mecklenburg Board of Education,*
402 U. S. 1, 16 (1971). Systemwide remedies such as were
ordered by the courts below, and today are approved by this
Court, lack any principled basis when the absence of integra-
tion in all schools cannot reasonably be attributed to dis-
criminatory conduct.[2]

MR. JUSTICE REHNQUIST has dealt devastatingly with the

---

[2] As I suggested in my separate opinion in *Keyes,* it is essential to iden-
tify the constitutional right that is asserted in school desegregation cases.
The Court's decisions hardly have been lucid on this point. In *Brown* v.
*Board of Education,* 349 U. S. 294 (1955) (*Brown II*), the Court identified
the "fundamental principle" enunciated in *Brown I,* as being the unconstitu-
tionality of "racial discrimination in public education." 349 U. S., at 298.
In *Keyes,* I undertook to define the right, derived from the Equal Pro-
tection Clause, as one to attend an "integrated school system," a system
in which school authorities take into consideration the enhancement of
integrated school opportunities in addition to the goal of quality education
in making and implementing their customary decisions. 413 U. S., at 226.
I also noted that an integrated system does not mean that *"every school
must in fact be an integrated unit,"* *id.,* at 227, and emphasized that the
Equal Protection Clause "does not require that school authorities under-
take widespread student transportation solely for the sake of maximizing
integration." *Id.,* at 242. When challenged, the school authorities must
show that in fact they are operating an integrated system in the foregoing
sense. This is quite different from the burden imposed on the school
authorities by the Court of Appeals and the District Court in No. 78–610,
of proving, by a preponderance of the evidence, that they have met an
affirmative duty in existence since 1954 to eliminate every racially iden-
tifiable school "root and branch."

way in which the Court of Appeals endowed prior precedents with new and wondrous meanings. I can add little to what he has said. I therefore move to more general but, in my view, important considerations that the Court simply ignores.

## II

Holding the school boards of these two cities responsible for *all* of the segregation in the Dayton and Columbus systems and prescribing fixed racial ratios in every school as the constitutionally required remedy necessarily implies a belief that the same school boards—under court supervision—will be capable of bringing about and maintaining the desired racial balance in each of these schools. The experience in city after city demonstrates that this is an illusion. The process of resegregation, stimulated by resentment against judicial coercion and concern as to the effect of court supervision of education, will follow today's decisions as surely as it has in other cities subjected to similar sweeping decrees.

The orders affirmed today typify intrusions on local and professional authorities that affect adversely the quality of education. They require an extensive reorganization of both school systems, including the reassignment of almost half of the 96,000 students in the Columbus system and the busing of some 15,000 students in Dayton. They also require reassignments of teachers and other staff personnel, reorganization of grade structures, and the closing of certain schools. The orders substantially dismantle and displace neighborhood schools in the face of compelling economic and educational reasons for preserving them. This wholesale substitution of judicial legislation for the judgments of elected officials and professional educators derogates the entire process of public education.[3] Moreover, it constitutes a serious interference

---

[3] Defending lawsuits that remain active for years and complying with elaborate court decrees also divert the time, attention, and resources of school authorities from education.

with the private decisions of parents as to how their children will be educated. These harmful consequences are the inevitable byproducts of a judicial approach that ignores other relevant factors in favor of an exclusive focus on racial balance in every school.

These harmful consequences, moreover, in all likelihood will provoke responses that will defeat the integrative purpose of the courts' orders. Parents, unlike school officials, are not bound by these decrees and may frustrate them through the simple expedient of withdrawing their children from a public school system in which they have lost confidence. In spite of the substantial costs often involved in relocation of the family or in resort to private education,[4] experience demonstrates that many parents view these alternatives as preferable to submitting their children to court-run school systems. In the words of a leading authority:

"An implication that should have been seen all along but can no longer be ignored is that a child's enrollment in a given public school is not determined by a governmental decision alone. It is a joint result of a governmental decision (the making of school assignments) and parental decisions, whether to remain in the same residential location, whether to send their child to a private school, or which school district to move into when moving into a metropolitan area. The fact that the child's enrollment is a result of two decisions operating jointly means that government policies must, to be effective, anticipate parental decisions and obtain the parents' active cooperation in implementing school policies." Cole-

[4] A third alternative is available to parents moving for the first time into a metropolitan area where a school district is operating under a "system-wide remedy" decree. To avoid the probability of their children being bused away from neighborhood schools, and in view of the widely held belief that the schools under a court decree are likely to be inferior, these parents may seek residences beyond the urban school district.

man, New Incentives for Desegregation, 7 Human Rights, No. 3, pp. 10, 13 (1978).

At least where inner-city populations comprise a large proportion of racial minorities and surrounding suburbs remain white, conditions that exist in most large American cities, the demonstrated effect of compulsory integration is a substantial exodus of whites from the system. See J. Coleman, S. Kelly, & J. Moore, Trends in School Segregation, 1968–1973, pp. 66, 76–77 (1975). It would be unfair and misleading to attribute this phenomenon to a racist response to integration *per se.* It is at least as likely that the exodus is in substantial part a natural reaction to the displacement of professional and local control that occurs when courts go into the business of restructuring and operating school systems.

Nor will this resegregation be the only negative effect of court-coerced integration on minority children. Public schools depend on community support for their effectiveness. When substantial elements of the community are driven to abandon these schools, their quality tends to decline, sometimes markedly. Members of minority groups, who have relied especially on education as a means of advancing themselves, also are likely to react to this decline in quality by removing their children from public schools.[5] As a result,

---

[5] Academic debate has intensified as to the degree of educational benefit realized by children due to integration. See R. Crain & R. Mahard, The Influence of High School Racial Composition on Black College Attendance and Test Performance (1978); Coleman, New Incentives for Desegregation, 7 Human Rights, No. 3, p. 10 (1978); Weinberg, The Relationship Between School Desegregation and Academic Achievement: A Review of the Research, 39 Law & Contemp. Prob., No. 2, p. 241 (1975). Much of the dispute seems beside the point. It is essential that the diverse peoples of our country learn to live in harmony and mutual respect. This end is furthered when young people attend schools with diverse student bodies. But the benefits that may be achieved through this experience often will be compromised where the methods employed to promote integration include coercive measures such as forced transportation to achieve some

public school enrollment increasingly will become limited to children from families that either lack the resources to choose alternatives or are indifferent to the quality of education. The net effect is an overall deterioration in public education, the one national resource that traditionally has made this country a land of opportunity for diverse ethnic and racial groups. See *Keyes,* 413 U. S., at 250 (opinion of POWELL, J.).

### III

If public education is not to suffer further, we must "return to a more balanced evaluation of the recognized interests of our society in achieving desegregation with other educational and societal interests a community may legitimately assert." *Id.,* at 253. The ultimate goal is to have quality school systems in which racial discrimination is neither practiced nor tolerated. It has been thought that ethnic and racial diversity in the classroom is a desirable component of sound education in our country of diverse populations, a view to which I subscribe. The question that courts in their single-minded pursuit of racial balance seem to ignore is how best to move toward this goal.

For a decade or more after *Brown I,* the courts properly focused on dismantling segregated school systems as a means of eliminating state-imposed discrimination and furthering wholesome diversity in the schools.[6] Experience in recent

---

theoretically desirable racial balance. Cf. N. St. John, School Desegregation Outcomes for Children (1975).

[6] During this period the issues confronted by the courts by and large involved combating the devices by which States deliberately perpetuated dual school systems and dismantling segregated systems in small, rural areas. *E. g., Green* v. *County School Board,* 391 U. S. 430 (1968); *Griffin* v. *School Board,* 377 U. S. 218 (1964); *Goss* v. *Board of Education,* 373 U. S. 683 (1963); *Cooper* v. *Aaron,* 358 U. S. 1 (1958). See Wilkinson, The Supreme Court and Southern School Desegregation, 1955–1970: A History and Analysis, 64 Va. L. Rev. 485 (1978). This Court did not begin to face the difficult administrative and social problems associated with *de facto* segregation in large urban school systems until *Swann* v.

years, however, has cast serious doubt upon the efficacy of far-reaching judicial remedies directed not against specific constitutional violations, but rather imposed on an entire school system on the fictional assumption that the existence of identifiable black or white schools is caused entirely by intentional segregative conduct, and is evidence of system-wide discrimination. In my view, some federal courts—now led by this Court—are pursuing a path away from rather than toward the desired goal. While these courts conscientiously view their judgments as mandated by the Constitution (a view that would have astonished constitutional scholars throughout most of our history), the fact is that restructuring and overseeing the operation of major public school systems— as ordered in these cases—fairly can be viewed as social engineering that hardly is appropriate for the federal judiciary.

The time has come for a thoughtful re-examination of the proper limits of the role of courts in confronting the intractable problems of public education in our complex society. Proved discrimination by state or local authorities should never be tolerated, and it is a first responsibility of the judiciary to put an end to it where it has been proved. But many courts have continued also to impose wide-ranging decrees, and to retain ongoing supervision over school systems. Local and state legislative and administrative authorities have been supplanted or relegated to initiative-stifling roles as minions of the courts. Indeed, there is reason to believe that some legislative bodies have welcomed judicial activism with respect to a subject so inherently difficult and so politically sensitive that the prospect of others confronting it seems inviting. Federal courts no longer should encourage this deference by the appropriate authorities—no matter how willing they may

*Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971). It is especially unfortunate that the Court today refuses to acknowledge these problems and chooses instead to sanction methods that, although often appropriate and salutary in the earlier context, are disruptive and counter-productive in school systems like those in Columbus and Dayton.

be to defer. Courts are the branch least competent to provide long-range solutions acceptable to the public and most conducive to achieving both diversity in the classroom and quality education.

School boards need not wait, and many have not waited, for innovative legislative guidance. The opinion of the Court in *Swann,* though often cited (as in this case) for views I think were never intended, identified some constructive actions always open to school authorities:

> "An optional majority-to-minority transfer provision has long been recognized as a useful part of every desegregation plan. Provision for optional transfer of those in the majority racial group of a particular school to other schools where they will be in the minority [or less in the majority] is an indispensable remedy for those students willing to transfer to other schools in order to lessen the impact on them of the state-imposed stigma of segregation. In order to be effective, such a transfer arrangement must grant the transferring student free transportation and space must be made available in the school to which he desires to move." 402 U. S., at 26–27.

See also *Keyes,* 413 U. S., at 240–241 (opinion of POWELL, J.). Incentives can be employed to encourage these transfers, such as creation of magnet schools providing special educational benefits and state subsidization of those schools that expand their minority enrollments. See, *e. g.,* Willie, Racial Balance or Quality Education?, in School Desegregation, Shadow and Substance 7 (Levinsohn & Wright eds. 1976). These and like plans, if adopted voluntarily by States, also could help counter the effects of racial imbalances between school districts that are beyond the reach of judicial correction. See *Milliken* v. *Bradley,* 418 U. S. 717 (1974); cf. Coleman, 7 Human Rights, at 48–49.[7]

---

[7] Wisconsin has implemented a system of subsidized, voluntary, intra- and inter-district majority-to-minority transfers. 1975 Wis. Laws, ch. 220,

After all, and in spite of what many view as excessive government regulation, we are a free society—perhaps the most free of any in the world. Our people instinctively resent coercion, and perhaps most of all when it affects their children and the opportunities that only education affords them. It is now reasonably clear that the goal of diversity that we call integration, if it is to be lasting and conducive to quality education, must have the support of parents who so frequently have the option to choose where their children will attend school. Courts, of course, should confront discrimination wherever it is found to exist. But they should recognize limitations on judicial action inherent in our system and also the limits of effective judicial power. The primary and continuing responsibility for public education, including the bringing about and maintaining of desired diversity, must be left with school officials and public authorities.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE POWELL joins, dissenting.

The school desegregation remedy imposed on the Columbus school system by this Court's affirmance of the Court of Appeals is as complete and dramatic a displacement of local authority by the federal judiciary as is possible in our federal system. Pursuant to the District Court's order, 42,000 of the system's 96,000 students are reassigned to new schools. There are like reassignment of teachers, staff, and administrators, reorganization of the grade structure of virtually every

---

codified at Wis. Stat. § 121.85 (1975). It is too early to determine whether this experiment will attain its objective of encouraging substantial integration. But it is the sort of effort that should be considered by state and local officials and elected bodies. The contrast between the underlying philosophy of the Wisconsin plan and the massive coercion undertaken by the courts below is striking. See Meadows, Open Enrollment and Fiscal Incentives, in School Desegregation, Shadow and Substance 143 (Levinsohn & Wright eds. 1976).

elementary school in the system, the closing of 33 schools, and the additional transportation of 37,000 students.

It is difficult to conceive of a more serious supplantation because, as this Court recognized in *Brown* v. *Board of Education,* 347 U. S. 483, 493 (1954) (*Brown I*), "education is perhaps the most important function of state and local governments"; indeed, it is "a vital national tradition." *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406, 410 (1977) (*Dayton I*); see *Milliken* v. *Bradley,* 418 U. S. 717, 741–742 (1974); *Wright* v. *Council of City of Emporia,* 407 U. S. 451, 469 (1972). That "local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process," *Milliken, supra,* at 741–742, does not, of course, place the school system beyond the authority of federal courts as guardians of federal constitutional rights. But the practical and historical importance of the tradition does require that the existence of violations of constitutional rights be carefully and clearly defined before a federal court invades the traditional ambit of local control, and that the subsequent displacement of local authority be limited to that necessary to correct the identified violations. "It is for this reason that the case for displacement of the local authorities by a federal court in a school desegregation case must be satisfactorily established by factual proof and justified by a reasoned statement of legal principles." *Dayton I, supra,* at 410.

I think the District Court and Court of Appeals in this case did not heed this admonition. One can search their opinions in vain for any concrete notion of what a "systemwide violation" consists of or how a trial judge is to go about determining whether such a violation exists or has existed. What logic is evident emasculates the key determinants set down in *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189 (1973), for proving the existence and scope of a violation warranting federal-court intervention: discriminatory purpose and a causal relationship between acts motivated by such a

purpose and a current condition of segregation in the school system. The lower courts' methodology would all but eliminate the distinction between *de facto* and *de jure* segregation and render all school systems captives of a remote and ambiguous past.

Today the Court affirms the Court of Appeals for the Sixth Circuit in this case and *Dayton Board of Education* v. *Brinkman* (*Dayton II*), *post,* p. 526, in opinions so Delphic that lower courts will be hard pressed to fathom their implications for school desegregation litigation. I can only offer two suggestions. The first is that the Court, possibly chastened by the complexity and emotion that accompanies school desegregation cases, wishes to relegate the determination of a violation of the Equal Protection Clause of the Fourteenth Amendment in any plan of pupil assignment, and the formulation of a remedy for its violation, to the judgment of a single district judge. That judgment should be subject to review under the "clearly erroneous" standard by the appropriate court of appeals, in much the same way that actions for an accounting between private partners in a retail shoe business or claimants in an equitable receivership of a failing commercial enterprise are handled. "Discriminatory purpose" and "systemwide violation" are to be treated as talismanic phrases which, once invoked, warrant only the most superficial scrutiny by appellate courts.

Such an approach is, however, obviously inconsistent with the *Dayton I* admonition and disparages both this Court's oft-expressed concern for the important role of local autonomy in educational matters and the significance of the constitutional rights involved. It also holds out the disturbing prospect of very different remedies being imposed on similar school systems because of the predilections of individual judges and their good-faith but incongruent efforts to make sense of this Court's confused pronouncements today.[1] Concepts such as

---

[1] See *Dayton Board of Education* v. *Brinkman* (*Dayton II*), *post,* p. 542 (REHNQUIST, J., dissenting).

"discriminatory purpose" and "systemwide violation" present highly mixed questions of law and fact. If district court discretion is not channelized by a clearly articulated methodology, the entire federal-court system will experience the disaffection which accompanies violation of Cicero's maxim not to "lay down one rule in Athens and another rule in Rome."

Yet, the only alternative reading of today's opinions, i. e., a literal reading, is even more disquieting. Such a reading would require embracing a novel analytical approach to school segregation in systems without a history of statutorily mandated separation of the races—an approach that would have dramatic consequences for urban school systems in this country. Perhaps the adjective "analytical" is out of place, since the Court's opinions furnish only the most superficial methodology, a framework which if it were to be adopted ought to be examined in a far more thorough and critical manner than is done by the Court's "lick and a promise" opinions today. Given the similar approaches employed by the Court in this case and *Dayton II*, this case suffices for stating what I think are the glaring deficiencies both in the Court's new framework and in its decision to subject the Columbus school system to the District Court's sweeping racial balance remedy.

I

The Court suggests a radical new approach to desegregation cases in systems without a history of statutorily mandated separation of the races: if a district court concludes—employing what in honesty must be characterized as an irrebuttable presumption—that there was a "dual" school system at the time of *Brown I,* 347 U. S. 483 (1954), it must find post-1954 constitutional violations in a school board's failure to take every affirmative step to integrate the system. Put differently, *racial imbalance* at the time the complaint is filed is sufficient to support a systemwide, racial balance, school busing

remedy if the district court can find *some* evidence of discriminatory purpose prior to 1954, without any inquiry into the causal relationship between those pre-1954 violations and current segregation in the school system.

This logic permeates the findings of the District Court and Court of Appeals, and the latter put it most bluntly.

> "[T]he District Judge on review of pre-1954 history found that the Columbus schools were de jure segregated in 1954 and, hence, the Board had a continuing constitutional duty to desegregate the Columbus schools. The pupil assignment figures for 1975–76 demonstrate the District Judge's conclusion that this burden has not been carried. On this basis alone (if there were no other proofs), we believe we would be required to affirm the District Judge's finding of present unconstitutional segregation." 583 F. 2d 787, 800 (1978).

In *Brinkman* v. *Gilligan,* 583 F. 2d 243, 256 (CA6 1978), also affirmed today, this post-1954 "affirmative duty" is characterized as a duty "to diffuse black and white students" throughout the system.

The Court in this case apparently endorses that view. For the Court finds that "[e]ach instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment," *ante,* at 459, and the mere fact that at the time of suit "most blacks were still going to black schools and most whites to white schools" establishes current effect. *Ante,* at 461.

In order to fully comprehend the dramatic reorientation the Court's opinion thus implies, and its lack of any principled basis, a brief historical review is necessary. In 1954, this Court announced *Brown I* and struck down on equal protection grounds laws requiring or permitting school assignment of children on the basis of race. See also *Bolling* v. *Sharpe,* 347 U. S. 497 (1954). The question of remedy was reserved for a new round of briefing, and the following Term this Court

remanded to the District Courts in the five consolidated cases "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases." *Brown* v. *Board of Education,* 349 U. S. 294, 301 (1955) *(Brown II).*

The majority concedes that this case does not involve racial assignment of students mandated by state law; Ohio abandoned any "statutory requirement or authorization to operate segregated schools" by 1888. *Ante,* at 455. Yet, it was precisely this type of segregation—segregation expressly mandated or permitted by state statute or constitution—that was addressed by *Brown I,* and the mandate of the *Brown* cases was that "[a]ll provisions of federal, state, or local law requiring or permitting such discrimination must yield" to "the fundamental principle that racial discrimination in public education is unconstitutional." 349 U. S., at 298. The message of *Brown II* was simple and resonant because the violation was simple and pervasive.

There were, however, some issues upon which the *Brown II* Court was vague. It did not define what it meant by "effectuat[ing] a transition to a racially nondiscriminatory school system," *id.,* at 301, and therefore the next 17 years focused on the question of the appropriate remedy where racial separation had been maintained by operation of state law.

The earliest post-*Brown* school cases in this Court only intimated that "a transition to a racially nondiscriminatory school system" required adoption of a policy of nondiscriminatory admission.[2] It was not until the 1967 Term that this

---

[2] *Cooper* v. *Aaron,* 358 U. S. 1 (1958); *Goss* v. *Board of Education,* 373 U. S. 683 (1963); *Griffin* v. *School Board,* 377 U. S. 218 (1964).

In discussing the *Brown II* mandate, this Court in *Cooper* v. *Aaron, supra,* at 7, observed:

"Of course, in many locations, obedience to the duty of desegregation would require the immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular

Court indicated that school systems with a history of statutorily or constitutionally mandated separation of the races would have to do more than simply permit black students to attend white schools and vice versa. In that Term, the Court had before it "freedom-of-choice" plans put forward as desegregation remedies. The factual context of the lead case, *Green* v. *County School Board,* 391 U. S. 430 (1968), is a far cry from the complicated urban metropolitan system we confront today. The New Kent County school system consisted of two schools—one black and one white—with a total enrollment of 1,300 pupils. At the time of suit a black student had

---

schools. On the other hand, a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of all qualified Negro children."

A similar limited expectation pervades *Goss* v. *Board of Education, supra,* where this Court invalidated court-ordered desegregation plans which permitted transfers on the basis of race. Specifically, the desegregation plan called for the redrawing of school districts without reference to race, but explicitly authorized transfers by students of one race from a school where their race was a minority to a school where their race was a majority. There was no provision for majority-to-minority school transfers. This Court objected to the explicit racial character of the transfer program.

"Our task then is to decide whether these transfer provisions are . . . unconstitutional. In doing so, we note that if the transfer provisions were made available to all students regardless of their race and regardless as well of the racial composition of the school to which he requested transfer we would have an entirely different case. Pupils could then at their option (or that of their parents) choose, entirely free of any imposed racial considerations, to remain in the school of their zone or transfer to another." 373 U. S., at 687.

*Griffin* v. *School Board, supra,* involved a situation where a school system literally closed down its schools rather than desegregate. The decree endorsed by this Court, in the face of massive resistance, was simply an order to the school board requiring it to admit students without regard to race to a white high school and to make plans for admissions to elementary schools without regard to race.

never attended the white school or a white student the black school.

This Court found that the "freedom-of-choice" plan approved by the District Court for the desegregation of the New Kent County schools was inadequate. Noting that the "pattern of separate 'white' and 'Negro' schools in the New Kent County school system established under compulsion of state laws is precisely the pattern of segregation to which *Brown I* and *Brown II* were particularly addressed," the Court observed that *Brown II* charged "[s]chool boards such as the respondent then operating state-compelled dual systems . . . with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U. S., at 435, 437–438. In the three years following court approval of the freedom-of-choice plan in New Kent County, not a single white child had chosen to attend the historically black school, which continued to serve 85% of the county's black schoolchildren. The *Green* Court concluded that a freedom-of-choice plan, in a school system such as this and in the absence of other efforts at desegregation, was not sufficient to provide the remedy mandated by *Brown II*. The Court suggested zoning, *i. e.*, some variation of a neighborhood school policy, as a possible alternative remedy.[3]

---

[3] Two other cases were handed down on the same day as *Green*. *Raney* v. *Board of Education*, 391 U. S. 443 (1968), involved an almost identical factual situation with a similar experience under a freedom-of-choice plan. For the same reasons that such a plan was inadequate for New Kent County, it was found inadequate for the Gould School District involved in the *Raney* litigation. The other case handed down with *Green*, *Monroe* v. *Board of Comm'rs*, 391 U. S. 450 (1968), concerned the city of Jackson, Tenn. At issue in that case was a "free-transfer" rather than "freedom-of-choice" plan. The "free-transfer" provisions were part of a court-ordered plan that essentially instituted a neighborhood school policy for the three junior high schools in the system. Any child could transfer to another school if space was available, *i. e.*, if there were no neighborhood-zone residents to fill the spaces. This Court did not object to the

That brings the history of school desegregation litigation in this Court to THE CHIEF JUSTICE'S opinion in *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971), upon which the majority and respondents heavily rely.[4] *Swann* also addressed school systems with a history of statutorily or constitutionally mandated separation of the races; "[t]hat was what *Brown* v. *Board of Education* was all about." *Id.*, at 6. *Swann* was an attempt to define "in more precise terms" the appropriate scope of the *remedy* in cases of that nature. *Ibid.* It simply did not attempt to articulate the manner by which courts were to determine the existence of a *violation* in school systems without a history of segregation imposed by statute or the state constitution.[5] Certainly school systems with such a history were charged by *Brown II* to "effectuate a transition to a racially nondiscriminatory school system." But *Swann* did not speak of the failure to conform to this duty as a "continuing violation." The specific references to an affirmative duty in *Swann* were to the

neighborhood school policy as part of a remedy, even though some neighborhoods were racially identifiable, but it found that the effect of the free-transfer policy was to maintain the racial characters of the three junior high schools. One remained all black and another 99% white.

[4] There were two school desegregation cases heard in this Court in the years between *Swann* and *Green*. *Alexander* v. *Holmes County Board of Education*, 396 U. S. 19 (1969), reiterated that the era of "all deliberate speed" had ended. *United States* v. *Montgomery County Board of Education*, 395 U. S. 225 (1969), involved an order requiring the reassignment of some faculty and staff of the Montgomery County school system in line with numerical targets set by the District Court.

[5] Nevertheless, the Court of Appeals refers to *Swann* as an opinion which "dealt more thoroughly than any other opinion of the Court with the method of proof of constitutional violations," 583 F. 2d 787, 793 (CA6 1978), and relies on it throughout its opinion for standards of proof in determining the existence of a violation. *Swann* was in fact an attempt to articulate the "equitable remedial discretion of the District Court" which admits more latitude than the standards for determining a violation. 402 U. S., at 25; see *id.*, at 15–16. There is no "discretion" in the latter context.

duty of a school board found to have overseen a school system with state-imposed segregation to put forward a plan to remedy that situation. It was in this context that the Court observed that upon "default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system." 402 U. S., at 16.[6]

This understanding of the "affirmative duty" was acknowledged in the first case confronting a school system without a history of state-mandated racial assignment, *Keyes* v. *School Dist. No. 1, Denver, Colo.*, 413 U. S. 189 (1973). There the Court observed:

> "[W]e have held that where plaintiffs prove that a current condition of segregated schooling exists within a school district where a dual system was compelled or authorized by statute at the time of our decision in *Brown* v. *Board of Education*, 347 U. S. 483 (1954) (*Brown I*), the State automatically assumes an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system,' *Brown* v. *Board of Education*, 349 U. S.

---

[6] Later in its opinion, the *Swann* Court refers to the District Court's finding, "approved by the Court of Appeals, that the school board had totally defaulted in its acknowledged duty to come forward with an acceptable plan of its own, notwithstanding the patient efforts of the District Judge who, on at least three occasions, urged the board to submit plans." *Id.*, at 24.

Four other cases came down the same day as *Swann*. One was dismissed for lack of jurisdiction, *Moore* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 47 (1971); one upheld a declaration that a North Carolina antibusing law was unconstitutional, *North Carolina State Board of Education* v. *Swann*, 402 U. S. 43 (1971); and another remanded a remedy order for reconsideration in light of criteria laid down in *Swann*, *Davis* v. *Board of School Comm'rs of Mobile County*, 402 U. S. 33 (1971). The final case, *McDaniel* v. *Barresi*, 402 U. S. 39 (1971), invalidated a state-court order barring on federal grounds a formerly statutory dual system's voluntary transition to a modified neighborhood school policy.

294, 301 (1955) (*Brown II*), see also *Green* v. *County School Board,* 391 U. S. 430, 437–438 (1968), that is, to eliminate from the public schools within their school system 'all vestiges of state-imposed segregation.' *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15 (1971).

"This is not a case, however, where a statutory dual system has ever existed." *Id.,* at 200–201 (footnote omitted).

It was at this juncture that the Court articulated the proposition that has become associated with *Keyes.*

"Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system." *Id.,* at 201.

The notion of an "affirmative duty" as acknowledged in *Keyes* is a remedial concept defining the obligation on the school board to come forward with an effective desegregation plan *after* a finding of a dual system. This could not be clearer in *Keyes* itself.

"[P]roof of state-imposed segregation in a substantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system. Of course, where that finding is made, as in cases involving statutory dual systems, the school authorities have an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system.' *Brown II, supra,* at 301." *Id.,* at 203.[7]

---

[7] The point is reiterated later in the *Keyes* opinion.

"If the District Court determines that the Denver school system is a dual school system, respondent School Board has the affirmative duty to desegregate the entire system 'root and branch.' " 413 U. S., at 213.

Indeed, *Keyes* did not discuss the complexion of the Denver school system in 1954 or in any other way intimate the analysis adopted by the Court today.[8] Rather, it emphasized that the relevance of past actions was determined by their causal relationship to current racially imbalanced conditions.

Even so brief a history of our school desegregation jurisprudence sheds light on more than one point. As a matter of history, case law, or logic, there is nothing to support the novel proposition that the primary inquiry in school desegregation cases involving systems without a history of statutorily mandated racial assignment is what happened in those systems before 1954. As a matter of history, 1954 makes no more sense as a benchmark—indeed it makes *less* sense—than 1968, 1971, or 1973. Perhaps the latter year has the most to commend it, if one insists on a benchmark, because in *Keyes* this Court first confronted the problem of school segregation in the context of systems without a history of statutorily mandated separation of the races.

As a matter of logic, the majority's decision to turn the year 1954 into a constitutional Rubicon also fails. The analytical underpinnings of the concept of discriminatory purpose have received their still incomplete articulation in the 1970's. It is sophistry to suggest that a school board in Columbus in 1954 could have read *Brown I* and gleaned from it a constitutional duty "to diffuse black students throughout the . . . system" or take whatever other action the Court today thinks it should have taken. And not only was the school board to anticipate the state of the law 20 years hence, but also to have a full

---

[8] In fact, this theory was pressed upon the Court in *Dayton I,* Brief for Respondents, O. T. 1976, No. 76–539, pp. 58–71; yet it was implicitly rejected in this Court's detailed articulation of the proper approach to equal protection challenges involving school systems "where mandatory segregation by law of the races in the schools has long since ceased." 433 U. S., at 420.

appreciation for discrete acts or omissions of school boards 20 to 50 years earlier.[9]

Of course, there are always instances where constitutional standards evolve and parties are charged with conforming to the new standards. But I am unaware of a case where the failure to anticipate a change in the law and take remedial steps is labeled an independent constitutional violation. The difference is not simply one of characterization: the Court's decision today enunciates, without analysis or explanation, a new methodology that dramatically departs from *Keyes* by relieving school desegregation plaintiffs from any showing of a causal nexus between intentional segregative actions and the conditions they seek to remedy.

Causality plays a central role in *Keyes* as it does in all equal protection analysis. The *Keyes* Court held that before the burden of production shifts to the school board, the plaintiffs must prove "that the school authorities have carried out a systematic program of segregation *affecting a substantial portion of the students, schools, teachers, and facilities within the school system.*" 413 U. S., at 201 (emphasis added). The Court recognized that a trial court might find "that a lesser degree of segregated schooling . . . would not have resulted even if the Board had not acted as it did," and "that at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of *de jure* segregation warranting judicial intervention." *Id.,* at 211. The relevance of past acts of the school board was to depend on whether "segregation resulting from those actions continues to exist." *Id.,* at 210.[10] That inquiry is not central under the approach

---

[9] As the Court notes, incidents relied on by the District Court occurred anywhere from 1909 to 1943.

[10] "The essential element of *de jure* segregation is 'a current condition of segregation resulting from intentional state action.'" *Washington* v. *Davis,* 426 U. S. 229, 240 (1976) (quoting *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S., at 205).

approved by the Court today. Henceforth, the question is apparently whether pre-1954 acts contributed in some unspecified manner to segregated conditions that existed in 1954. If the answer is "Yes," then the only question is whether the school board has exploited all integrative opportunities that presented themselves in the subsequent 25 years. If not, a systemwide remedy is in order, despite the plaintiff's failure to demonstrate a link between those past acts and current racial imbalance.

The Court's use of the term "affirmative duty" implies that integration be the pre-eminent—indeed, the controlling—educational consideration in school board decisionmaking. It takes precedence over other legitimate educational objectives subject to some vague feasibility limitation. That implication is dramatically demonstrated in this case. Both lower courts necessarily gave special significance to the Columbus School Board's post-1954 school construction and siting policies as supporting the systemwide remedy in this case.[11] They did not find—in fact, could not have found—that the siting and construction of schools were racially motivated. As the District Court observed:

> "In 1950, pursuant to a request of the then Columbus school superintendent, the Bureau of Educational Research at The Ohio State University began a comprehensive, scientific and objective analysis of the school plant needs of the school system. The Bureau studied and re-

---

[11] The reliance on school construction was critical. As the Court of Appeals found, the other post-1954 incidents relied on by the District Court were "isolated," 583 F. 2d, at 805, and therefore could not have constituted a basis for a systemwide remedy. *Dayton I,* 433 U. S. 406 (1977). And the only other conduct arguably having systemwide implications, racial assignment of teachers, had been corrected, was not the subject of any remedial order, 429 F. Supp. 229, 238, 260 (SD Ohio 1977), and, in any event, could not itself support the systemwide remedy under the Sixth Circuit's own precedents. *Higgins* v. *Board of Education of City of Grand Rapids,* 508 F. 2d 779 (CA6 1974); see *Dayton II, post,* at 536 n. 9.

ported on community growth characteristics, educational programs, enrollment projections, the system's plan of organization, the existing plant, and the financial ability of the community to pay for new school facilities. Thereafter, a number of general and specific recommendations were made to the Columbus Board by the Bureau. The recommendations included the size and location of new school sites as well as additions to existing sites. The recommendations were conceived to accommodate the so-called 'community or neighborhood school concept.' The 1950 concept was related to a distance criteria grounded on walking distance to schools as follows: $\frac{3}{4}$ mile for elementary, $1\frac{1}{2}$ miles for junior high and 2 miles for senior high students.

"The Board of Education adopted and relied upon the Bureau's recommendations in proposing and encouraging the passage of bond issues in 1951, 1953, 1956, 1959 and 1964. School construction of new facilities and additions to existing structures were accomplished in substantial conformity with the Bureau's periodic studies and recommendations." 429 F. Supp. 229, 237–238 (SD Ohio 1977).

Thus, the Columbus Board of Education employed the most objective criteria possible in the placement of new schools.

Nevertheless, the District Court and Court of Appeals found that conformity with these recommendations was a violation of the Equal Protection Clause because "in some instances the need for school facilities could have been met in a manner having an integrative rather than a segregative effect." *Id.,* at 243.[12] By endorsing this logic, the Court, as a result of its

_____

[12] Prefacing its discussion with the observation that "in some instances initial site selection and boundary changes present integrative opportunities," 429 F. Supp., at 241, the District Court made specific findings only with respect to 2 of the 103 schools constructed between 1950 and 1975 in the Columbus school system—Gladstone Elementary and Sixth Avenue

finding of an affirmative duty, employs remedy standards to determine the existence of post-1954 violations in school construction and ignores the previously pivotal role of discriminatory purpose.[13]

---

Elementary—1 of which does not exist today. The sites for both schools followed recommendations by the Bureau of Education Research of Ohio State University. Ohio State University Bureau of Educational Research, The 1958–1959 Study of the Public School Building Needs of Columbus, Ohio 58 (1959) (Sixth Avenue); Ohio State University Bureau of Educational Research, The 1963–1964 Study of the Public School Building Needs of Columbus, Ohio 65 (1964) (Gladstone).

The Gladstone Elementary School opened in 1965. The "violation" inherent in that siting is described as follows by the District Court and this passage is quoted and fully adopted by the Court of Appeals.

"The need for greater school capacity in the general Duxberry area would have been logically accommodated by the construction of Gladstone north of its present location, nearer to Hudson Street. This would, of course, require some redrawing of boundary lines in order to accommodate the need for class space in Hamilton and Duxberry. If, however, the boundary lines had been drawn on a north-south pattern rather than an east-west pattern, as some suggested, the result would have been an integrative effect on Hamilton, Duxberry and the newly-constructed school." 429 F. Supp., at 242, quoted in 583 F. 2d, at 803.

Thus, the placement of Gladstone is a violation—not because the placement was racially motivated, it was demonstrably not so—but because another site would have had a more integrative impact, and it is a violation despite the determination by the Bureau of Educational Research that objective and legitimate educational criteria militated in favor of the Gladstone site.

The secondary status of educational objectives other than integration is even more obvious in the discussion of the Sixth Avenue School where the District Court characterized the relevant inquiry as whether "the objectives of racial integration would have been better served" by a different site and different boundaries. 429 F. Supp., at 243. The Sixth Avenue School does not exist any more, and students within its old boundaries attend two neighboring, racially balanced schools.

[13] This is explicitly recognized by the Court in *Dayton II, post,* at 538 (emphasis added):

"[T]he measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, *not the*

This unprecedented "affirmative duty" superstructure sits atop a weak foundation—the existence of a "dual" school system in 1954. This finding was predicated on the presence

purpose, of the actions in decreasing or increasing the segregation caused by the dual system."

But the cases relied on by the Court, ante, at 459, to establish this affirmative duty and its implications—Dayton I, Wright v. Council of City of Emporia, 407 U. S. 451 (1972), and United States v. Scotland Neck Board of Education, 407 U. S. 484 (1972)—bear absolutely no relation to the analysis in this case. The pages cited from Dayton I simply endorse a Court of Appeals' observation that there is nothing wrong with a school board rescinding resolutions it was under no duty to promulgate; as I have indicated, the analysis set out in Dayton I is entirely inconsistent with the "affirmative duty" invoked by the courts below. See n. 8, supra. The citation to Wright is equally mysterious. The city of Emporia is located in Greensville County, Va. Up until 1968, it was part of Greensville County's public school system. A desegregation lawsuit was initiated in 1965 and resulted in a court-ordered "freedom-of-choice" desegregation plan for the Greensville County schools, including those within the city of Emporia. After Green, the court modified its decree and ordered pairing of certain schools. The city of Emporia then announced its intention to withdraw its schools from the Greensville County school system. The District Court enjoined it from doing so because Emporia's schools had been part of the adjudicated dual system, and the court's decree would be frustrated by withdrawal of the Emporia schools. In contrast the instant case has nothing to do with frustrating outstanding court orders.

United States v. Scotland Neck Board of Education, supra, was a case where the United States Department of Justice had been negotiating with the County School Board of Halifax County, N. C., in an attempt to bring it into compliance with federal law. In 1965, the schools of Halifax County were completely segregated on the basis of race. An agreement was reached that was designed to make the Halifax County school system unitary by the 1969 school year. However, in 1969, the North Carolina Legislature authorized a new independent school district in the middle of Halifax County which was to be bounded by the city limits of Scotland Neck. The United States promptly filed suit seeking desegregation of the Halifax County schools and an injunction blocking Scotland Neck's withdrawal. The District Court ordered desegregation of the Halifax County schools and enjoined creation of the independent Scotland Neck district. This Court held, quoting Wright, that if the

of four predominantly black elementary schools and one predominantly black junior high school on the "near east side of Columbus," a then and now black residential area. The Columbus School Board at that time employed, as it does now, a neighborhood school policy. The specific Board actions that the District Court cited were racial assignment of teachers and gerrymandering along part of the border between two school districts.[14] The Court concludes that these violations involved a substantial part of the Columbus school system in 1954, and invokes *Keyes* for the proposition that the finding of a dual school system follows "absent sufficient contrary proof by the Board, which was not forthcoming in this case." *Ante*, at 458.

There are two major difficulties with this use of *Keyes*. First, without any explanation, the Court for the first time applies it to define the character of a school system remote in time—here 25 or more years ago—without any examination of the justifications for the *Keyes* burden-shifting principles when those principles are used in this fashion. Their use is a matter of " 'policy and fairness,' " 413 U. S., at 209 (quoting 9 J. Wigmore, Evidence § 2486, p. 275 (3d ed. 1940)), and I think the *Keyes* "presumption" scores poorly on both counts when focused on a period beyond memory and often beyond

Scotland Neck " 'proposal would impede the dismantling of a dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out.' " 407 U. S., at 489. There is certainly no support in *Scotland Neck* for the analysis employed today, and the Court offers no explanation.

[14] As the Court today acknowledges, *Dayton II, post*, at 536 n. 9, racial assignment of teachers does not make out a *Keyes* showing regarding racial assignment of students. And testimony on the existence of gerrymandering went little beyond the establishment of an irregular boundary line. Testimony of W. A. Montgomery, App. 389–390. Cf. *Wright* v. *Rockefeller*, 376 U. S. 52 (1964). The District Court conceded that at the time of *Brown I*, there was "substantial racial mixing of both students and faculty in some schools" in the Columbus system. 429 F. Supp., at 236.

records.[15]   What records are available are equally available
to both sides.   In this case the District Court relied almost
exclusively on instances that occurred between 1909 and 1943:
undoubtedly beyond the period when many Board members
had their experiences with the system as students, let alone as
administrators.   It is much more difficult for school board
authorities to piece together the influences that shaped the
racial composition of a district 20, 30, or 40 years ago.   The
evidence on both sides becomes increasingly anecdotal.   Yet
the consequences of the School Board's inability to make such
a showing only become more dramatic.   Here violations with
respect to 5 schools, only 3 of which exist today, occurring
over 30 years ago are the key premise for a systemwide racial

---

[15] "The burdens of pleading and proof with regard to most facts have
been and should be assigned to the plaintiff who generally seeks to change
the present state of affairs and who therefore naturally should be expected
to bear the risk of failure of proof or persuasion."   E. Cleary, McCormick
on Evidence 786 (2d ed. 1972).

There is a policy judgment sometimes made, which "should not be over-
emphasized," *id.*, at 787, that the facts on a particular issue are so pecu-
liarly within the knowledge of a certain party that the burden of proof on
that issue should be allocated to him.   Whatever the merits of the burden-
shift to the school board where contemporaneous board decisions are at
issue, see *Keyes* v. *School Dist. No. 1, Denver, Colo.*, 413 U. S., at 262–
263 (REHNQUIST, J., dissenting), they do not commend a burden-shift
regarding conduct 25 or more years ago.

The Court charges that in questioning the propriety of employing the
*Keyes* burden-shift in this case, we "claim a better grasp of the historical
and ultimate facts than the two courts below had."   *Ante*, at 457 n. 6.   But
the *Keyes* burden-shift is not an ultimate finding of fact at all.   It is a
creature of this Court, brought into play by the making of only a prima
facie showing, and applied in this case in a completely novel way.   To
criticize its use is not to upset "factfinding," but to criticize the absence of
findings of fact which have heretofore been thought necessary in order to
support the sort of remedy imposed by the District Court.   Its use here
is surely no less a subject for this Court's review than it was in *Keyes*
itself.

balance remedy involving 172 schools—most of which did not exist in 1950.[16]

My second concern about the Court's use of the *Keyes* presumption may render my first concern academic. For as I suggest in Part III below, the Court today endorses views regarding the neighborhood school policy and racially identifiable neighborhoods that essentially make the *Keyes* presumption irrebuttable.

## II

The departure from established doctrines of causation and discriminatory purpose does not end with the lower courts' preoccupation with an "affirmative duty" exhumed from the conduct of past generations to be imposed on the present without regard to the forces that actually shaped the current racial imbalance in the school system. It is also evident in their examination of post-1954 violations, which the Court refers to as "the intentionally segregative use of optional attendance zones, discontiguous attendance areas, and boundary changes." *Ante,* at 461–462 (footnotes omitted).

As a preliminary matter, I note that the Court of Appeals observed, I think correctly, that these post-1954 incidents "can properly be classified as isolated in the sense that they do not form any systemwide pattern." 583 F. 2d, at 805. All the incidents cited, let alone those that can meet a properly applied segregative intent standard, could not serve as the basis for a systemwide racial balance remedy.

In *Washington* v. *Davis,* 426 U. S. 229 (1976), *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252

---

[16] The Columbus school system has changed dramatically in the last 25 years. The city grew from 40 square miles in 1950 to 173 square miles in 1975, and its student enrollment more than doubled. Many of the system's schools serve areas that were undeveloped in 1950. One hundred and three new school buildings were added during this period and 145 additions were made to existing buildings. On average, over 100 new classrooms were built each year.

(1977), and *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U. S. 256 (1979), we have emphasized that discriminatory purpose as a motivating factor in governmental action is a critical component of an equal protection violation. Like causation analysis, the discriminatory-purpose requirement sensibly seeks to limit court intervention to the rectification of conditions that offend the Constitution—stigma and other harm inflicted by racially motivated governmental action—and prevent unwarranted encroachment on the autonomy of local governments and private individuals which could well result from a less structured approach.

This Court has not precisely defined the manner in which discriminatory purpose is to be proved. Indeed, in light of the varied circumstances in which it might be at issue, simple and precise rules for proving discriminatory purpose could not be drafted. The focus of the inquiry in a case such as this, however, is not very difficult to articulate: Is a desire to separate the races among the reasons for a school board's decision or particular course of action? The burden of proof on this issue is on the plaintiffs. *Washington* v. *Davis, supra,* at 244–245; *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra,* at 270.

The best evidence on this score would be a contemporaneous explanation of its action by the school board, or other less dramatic evidence of the board's actual purpose, which indicated that one objective was to separate the races. See *Arlington Heights, supra,* at 268. Objective evidence is also probative. Indeed, were it not, this case would warrant very little discussion, for all the evidence relied on by the courts below was of an "objective" nature.

But objective evidence must be carefully analyzed for it may otherwise reduce the "discriminatory purpose" requirement to a "discriminatory impact" test by another name. Private and governmental conduct in matters of general importance to the community is notoriously ambiguous, and for

objective evidence to carry the day it must be a reliable index of actual motivation for a governmental decision—at least sufficient to meet the plaintiff's burden of proof on purpose or intent. We have only recently emphasized:

> " 'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts* v. *Feeney, supra,* at 279.

The maintenance of this distinction is important: both to limit federal courts to their constitutional missions and to afford school boards the latitude to make good-faith, color-blind decisions about how best to realize legitimate educational objectives without extensive *post hoc* inquiries into whether integration would have been better served—even at the price of other educational objectives—by another decision: a different school site, a different boundary, or a different organizational structure. In a school system with racially imbalanced schools, *every* school board action regarding construction, pupil assignment, transportation, annexation, and temporary facilities will promote integration, aggravate segregation, or maintain segregation. Foreseeability follows from the obviousness of that proposition. Such a tight noose on school board decisionmaking will invariably move government of a school system from the townhall to the courthouse.

The District Court in this case held that it was bound by the standard for segregative intent articulated by the Court of Appeals for the Sixth Circuit in *Oliver* v. *Michigan State Board of Education,* 508 F. 2d 178, 182 (1974):

> "A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation.

> The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies." 429 F. Supp., at 254 n. 3.

This is precisely the type of "impact" trigger for shifting the burden of proof on the intent component of an equal protection violation that we rejected in *Washington* v. *Davis, supra.* There the Court of Appeals had applied the standards of Title VII to determine whether a qualifying test for police candidates discriminated against blacks in violation of the Equal Protection Clause. According to the Court of Appeals, the plaintiffs were initially required to show disproportionate impact on blacks.[17] That impact was a constitutional violation absent proof by the defendants that the test was "an adequate measure of job performance in addition to being an indicator of probable success in the training program." 426 U. S., at 237. Put differently, the defendants were to show that the test was the product of a racially neutral policy. This Court reversed, rejecting "the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation." *Id.,* at 245.

Indeed, reflection indicates that the District Court's test for segregative intent in this case is logically nothing more than the affirmative duty stated a different way. Under the test, a "presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result

---

[17] To add the word "foreseeable" does not change the analysis, because the police department in *Davis* would be hard pressed to say that the disparate impact of the examination was unforeseeable. It is well documented that minorities do not perform as well as Anglo-Americans on standardized exams—principally because of cultural and socioeconomic differences. The *Davis* Court implicitly recognized that the impact in that and similar cases was foreseeable. 426 U. S., at 248, and n. 14. See *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U. S. 256, 278–279 (1979).

of public officials' . . . inaction was . . . perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their . . . inaction was a consistent and resolute application of racially neutral policies." If that standard were to be applied to the average urban school system in the United States, the implications are obvious. Virtually every urban area in this country has racially and ethnically identifiable neighborhoods, doubtless resulting from a mélange of past happenings prompted by economic considerations, private discrimination, discriminatory school assignments, or a desire to reside near people of one's own race or ethnic background. See *Austin Independent School Dist.* v. *United States,* 429 U. S. 990, 994 (1976) (POWELL, J., concurring). It is likewise true that the most prevalent pupil assignment policy in urban areas is the neighborhood school policy. It follows inexorably that urban areas have a large number of racially identifiable schools.

Certainly "public officials' . . . inaction . . . perpetuat[es] . . . public school segregation" in *this* context. School authorities could move to pairing, magnet schools, or any other device to integrate the races. The failure to do so is a violation under *Oliver* unless the "inaction was a consistent and resolute application of racially neutral policies." The policy that most school boards will rely on at trial, and the policy which the Columbus School Board in fact did rely on, is the neighborhood school policy. According to the District Court in this case, however, not only is that policy not a defense, but in combination with racially segregated housing patterns, it is itself a factor from which one can infer segregative intent and a factor in this case from which the District Court did infer segregative intent, stating that "[t]hose who rely on it as a defense to unlawful school segregation fail to recognize the high priority of the constitutional right involved." 429 F. Supp., at 258.

But the Constitution does not command that school boards not under an affirmative duty to desegregate follow a policy of "integration über alles." If the Court today endorses that view, and unfortunately one cannot be sure, it has wrought one of the most dramatic results in the history of public education and the Constitution. A duty not to discriminate in the school board's own actions is converted into a duty to ameliorate or compensate for the discriminatory conduct of other entities and persons.

I reserve judgment only because the Court at points in its opinion seems of the view that the District Court applied a test other than the *Oliver* test for segregative intent, despite the District Court's clear indication to the contrary. 429 F. Supp., at 253–254, n. 3. In fact, in *Dayton II, post,* at 536 n. 9, the Court expressly rejects the *Oliver* test, and in its opinion in this case, *ante,* at 464–465, indicates that the District Court treated foreseeable effects as only another bit of evidence and finds that not incompatible with this Court's prior cases.

> "Those cases do not forbid 'the foreseeable effects standard from being utilized as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn.' [429 F. Supp.], at 255. Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.' *Ibid.*"

I have no difficulty with the proposition that foreseeable effects are permissible considerations "as one of the several kinds of proofs" as long as they are not the only type of proof. Use of foreseeable effects in the latter fashion would be clearly inconsistent with *Davis, Arlington Heights,* and *Feeney.* But I do have great difficulty with this Court's taking the above

quotations from the District Court out of context and thereby imputing a general test for discriminatory purpose to the District Court from a passage which in fact was part of a discussion of the probativeness of a very special kind of evidence on intent: a neighborhood school policy *simpliciter*.[18]  As far as gauging the purpose underlying specific actions is concerned, it is quite clear from its expression and application of the relevant test for intent, that the District Court looked for foreseeability *per se*.[19]

[18] Specifically, the District Court prefaced its discussion of the neighborhood school policy with the following question:

"If a board of education assigns students to schools near their homes pursuant to a neighborhood school policy, and does so with full knowledge of segregated housing patterns and with full understanding of the foreseeable racial effects of its actions, is such an assignment policy a factor which may be considered by a court in determining whether segregative intent exists? A *majority* of the United States Supreme Court has not directly answered this question regarding *non-racially motivated inaction*." 429 F. Supp., at 254 (latter emphasis added).

Before today, I would have thought that the question whether *nonracially* motivated inaction was probative on discriminatory purpose would answer itself with an emphatic "No."  We have to date indicated that only *racially* motivated governmental decisionmaking is addressed by the Equal Protection Clause.  It was in the course of reasoning to an affirmative answer to this question that the District Court made the first observation quoted by the Court, *i. e.*, that the foreseeable effects of *nonracially motivated inaction* is probative on segregative intent.  And the second quotation lifts the District Court's conclusion on this issue out of context.

"*Substantial adherence to the neighborhood school concept* with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn." *Id.*, at 255 (emphasis added).

Thus the interesting proposition, worthy of Lewis Carroll at his best, that a *lack of discriminatory purpose* will not *by itself* support an inference of *discriminatory purpose*.

[19] In its general discussion of discriminatory intent or purpose, the District Court defines the relevant test as follows:

"The intent contemplated as necessary proof can best be described as

As such, the District Court's treatment of specific post-1954 conduct reflects the same cavalier approach to causality and purpose that underlies the 1954 affirmative duty. That determination requires no more "omnipotence and omniscience," *ante,* at 457 n. 6, than similar determinations in *Dayton I, Davis,* and *Arlington Heights.* The court found violations with respect to three optional attendance zones. The Near-Bexley zone, the only zone discussed by this Court, afforded students the option to attend schools in either one of two bordering districts. The District Court found that the zone gave white students of Bexley the opportunity to avoid attending the predominantly black schools to the east. I do not think that the District Court finding can be said to be clearly erroneous despite the lack of any direct evidence on discriminatory purpose, for the School Board did not suggest any educational justification for this zone and none is apparent. But as that court recognized, the zone is of little significance as far as the current state of segregation in the school system is concerned. *"The July 10, 1972, minutes of the State Board of Education . . . appear to indicate that in 1972, there were 25 public elementary school students and two public high school students residing in the optional zone."* 429 F. Supp., at 245 (emphasis added). As of 1975, the zone has been dismantled, and the District Court clearly suggests that it does not have any current effect on the Columbus school system.[20]

Two other optional attendance zones were identified as offen-

---

it is usually described—intent embodies the expectations that are the natural and probable consequences of one's act or failure to act. That is, the law presumes that one intends the natural and probable consequences of one's actions or inactions." *Id.,* at 252.

See *id.,* at 253–254, n. 3.

[20] *Id.,* at 245:

"The Court is not so concerned with the numbers of students who exercised or could have exercised this option, as it is with the light that the creation and maintenance of the option sheds upon the intent of the Columbus Board of Education."

sive. One existed for two years, between 1955 and 1957, and permitted students in a predominantly white neighborhood to attend the "white" West Broad Elementary School rather than the predominantly black Highland School. Like the Near-Bexley option, there is no apparent educational justification and, therefore, no grounds to upset the District Court's finding of a violation. This optional zone afforded the District Court an excellent opportunity to probe the effects of a past violation, because in 1957 the optional zone was made a permanent part of the West Broad district. But the District Court made no findings as to the current effect of the past violation nor saw fit to hypothesize how many students might have been affected. It was clearly of the opinion that no such inquiry was necessary.

The final optional attendance zone demonstrates the influence of the "affirmative duty"—whether the 1954 variety or that which follows from *Oliver*. This optional zone was also created in 1955 in roughly the same part of Columbus. It gave some students within Highland's boundaries the option of attending the neighboring West Mound Street Elementary School. Again, the District Court found, this permitted transfer to a "whiter" school. But the District Court also found that there was a legitimate educational objective for creation of the zone: Highland was overcrowded and West Mound was under capacity. The District Court, however, concluded that the School Board's actions were objectionable because "feasible alternatives" were available; that is, other optional attendance zones could have been drawn which would have had "an integrative effect on West Mound." This again suggests a duty on the School Board to select the most integrative alternative.

The second set of post-1954 actions faulted by the District Court were two discontiguous attendance areas. These were situations where students in a defined geographical area were assigned to a school in a zone not contiguous with their neigh-

borhood. One zone was established in 1963 and involved about 70 students. The School Board unsuccessfully argued at trial that the children were sent to the predominantly white Moler Elementary School because the nearest school, the predominantly black Alum Crest Elementary, had no room for them. The District Court indicates that this violative condition existed until 1969, presumably because after that date the discontiguous area had a substantial black population and an integrative effect on the Moler Elementary School. Since the discontiguous area now has an integrative effect, one might ask what is its current segregative effect on the school system? Ironically, under the District Court's reasoning, it would be a violation for the Columbus School Board to now disband the Moler Elementary discontiguous attendance area.

The second discontiguous zone existed from 1957 to 1963 and permitted students on three streets within the Heimandale Elementary District to attend the "whiter" Fornof Elementary School. The Columbus School Board "inherited" this discontiguous attendance arrangement when it annexed the Marion-Franklin District in 1957. Both schools at that time were at or over capacity and when a six-classroom addition was made to Heimandale in 1963, the discontiguous zone was terminated and the children assigned to Heimandale. According to the HEW Civil Rights Survey, Heimandale today is a racially balanced school. App. 747. The District Court made no findings as to the current effect of the Board's 5-year retention of the Heimandale-Fornof arrangement.

The last discrete violation discussed by the District Court involved the Innis-Cassady alternative organizational proposals. These proposals involved an area of the Columbus school district that was annexed in 1971. The area had one school, the Cassady Elementary School, which was very overcrowded, and placing another school in the district was a priority for the Columbus School Board in 1972. The District Court did not fault the site chosen for the second school in the old Mifflin District. However, it inferred segregative

intent in the School Board's decision to use a K–6 organization in both schools, rather than using K–3 organization in one school and 4–6 organization in the other and thereby drawing students from throughout the district. The District Court found that the latter would have been the more integrative alternative because of residential segregation in the district. At trial, the School Board attempted to justify its choice by pointing out that the pairing alternative would have required substantial transportation and a deviation from the standard K–6 organization employed throughout the Columbus school system. The court found "no evidence in this record" that pairing would have necessitated "substantial transportation" and that the Board had on prior occasions used a K–3 structure—apparently a reference to the K–3 primary center for crippled children.[21]

Thus, the Innis-Cassady discussion evinces this same affirmative duty to select the more integrative alternative and a consequent shift of the burden of proof to the School Board to prove that the segregative choice was mandated by other legitimate educational concerns. But under *Washington* v. *Davis* and *Arlington Heights* the burden is on the plaintiffs to show impact and purpose, and in a situation where there is "no evidence" in the record to prove or disprove a proffered justification for a school board decision, the plaintiffs have failed to establish a violation of their constitutional rights.

Secondly, the fact that a school board has once or twice or three times in the past deviated from a policy does not impugn that policy as a justification for a school board decision. There is no constitutional requirement of perfect consistency. *Arlington Heights*, 429 U. S., at 269. The fact that the Columbus School Board currently maintains a K–3 orga-

---

[21] There were apparently only two other instances where the Columbus School Board has had K–3 primary units and both of those were to supplement overcrowding in the lower grades of K–6 home schools. *Id.*, at 249.

nization for crippled children hardly diminishes the Board's interest in maintaining a standard organizational structure for traditional schools throughout the school district.[22] Rather, in *Arlington Heights* we spoke of substantive *departures* from existing policy as casting light on discriminatory purpose, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.*, at 267.

Thus, it is clear that with respect to a number of the post-1954 actions that the District Court found to be independent violations, foreseeability was not one kind of evidence, but the whole ball game—whether the District Court thought that result dictated by the *Oliver* test or the post-1954 "affirmative duty" purportedly imposed as a result of pre-1954 conduct. Those findings that could be supported by the concept of discriminatory purpose propounded in *Davis* and *Arlington Heights* were not accompanied by any effort to link those violations with current conditions of segregation in the school system. In sum, it is somewhat misleading for the Court to refer to these actions as in some sense independent of the constitutional duty it suggests that the Columbus Board assumed in 1954. And, in any event, the small number of students involved in these instances could not independently support the sweeping racial balance remedy imposed by the District Court. Cf. *Dayton I*, 433 U. S. 406 (1977).

## III

The casualness with which the District Court and Court of Appeals assumed that past actions of the Board had a

---

[22] There is substantial discussion in the District Court's opinion about various groups that gave the Columbus School Board notice that certain decisions would have a segregative rather than integrative impact. *Id.*, at 255–256. But notice in and of itself only goes so far as to establish foreseeability, and foreseeability itself is not the ultimate fact in issue if we continue to adhere to *Davis* and *Arlington Heights.*

continuing effect on the school system, and the facility and doctrinal confusion with which they went from these actions to announce a "systemwide violation" undermine the basic limitations on the federal courts' authority. If those violations are not the product of a careful inquiry of the impact on the current school system, if they are reaction to taint or atmosphere rather than identifiable conditions that would not exist now "but for" the constitutional violation, there are effectively no limits on the ability of federal courts to supplant local authority. Only two Terms ago, in *Dayton I, supra,* at 420, we set out the basic line of inquiry that should govern school desegregation litigation:

> "The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the school board which was intended to, and did in fact, discriminate against minority pupils, teachers, or staff. *Washington v. Davis, supra.* All parties should be free to introduce such additional testimony and other evidence as the District Court may deem appropriate. If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy. *Keyes,* 413 U. S., at 213."

See also *School Dist. of Omaha v. United States,* 433 U. S. 667 (1977); *Brennan v. Armstrong,* 433 U. S. 672 (1977).

The District Court made no attempt to determine the incremental segregative effects of identified violations; given the absence of causality considerations in the court's findings, it was simply not in a position to do so.[23] To distinguish *Dayton I,* the majority relies on the District Court's conclusion that its "finding of liability in this case concerns the Columbus school district as a whole." 429 F. Supp., at 266. But incantation is not a substitute for analysis and the District Court's findings and analysis do not support its conclusion.

But the majority's opinion takes on its most delusive

[23] *Dayton I* was handed down after the liability phase of this case. It was brought to the District Court's attention while it was considering the remedy, and the District Court dismissed it as simply reiterating the maxim that "the nature of the violation determines the scope of the remedy." Certainly *Dayton I* was a much more precise articulation of what implementing that maxim entailed than is found in this Court's prior cases. And the Court of Appeals' explanation of "incremental segregative effect" in this case communicates no clear conception of the type of inquiry into causation that *Dayton I* requires.

"It is clear to us that the phrases 'incremental segregative effect' and 'systemwide impact' employed in the *Dayton* case require that the question of systemwide impact be determined by judging segregative intent and impact as to each isolated practice, or episode. Each such practice or episode inevitably adds its own 'increment' to the totality of the impact of segregation. *Dayton* does not, however, require each of fifty segregative practices or episodes to be judged solely upon *its* separate impact on the system. The question posed concerns the impact of the total amount of segregation found—after each separate practice or episode has added its 'increment' to the whole. It was not just the last wave which breached the dike and caused the flood." 583 F. 2d, at 813–814 (emphasis in original).

In *Brinkman* v. *Gilligan,* 583 F. 2d 243, 257 (CA6 1978), the court's description becomes metaphysical:

"The word 'incremental' merely describes the manner in which segregative impact occurs in a northern school case where each act, even if minor in itself, adds incrementally to the ultimate condition of segregated schools. The impact is 'incremental' in that it occurs gradually over the years instead of all at once as in a case where segregation was mandated by a state statute or a provision of a state-constitution."

air when the Court suggests that the scope of the remedy is the Board's own fault.

> "[T]he Board was given ample opportunity to counter the evidence of segregative purpose and current, system-wide impact, and the findings of the courts below were against it in both respects." *Ante,* at 468.

Specifically, the Court is alluding to the Board's purported failure to show that the violation was not systemwide under *Keyes* or that a more limited remedy should have been applied under *Swann*. In fact, the logic of the District Court, apparently endorsed by the Court today, turns the *Swann* and *Keyes* showings into chimeras.

Once a showing is made that the District Court believes satisfies the *Keyes* requirement of purposeful discrimination in a substantial part of the school system, the School Board will almost invariably rely on its neighborhood school policy and residential segregation to show that it is not responsible for the existence of certain predominantly black and white schools in other parts of the school system. Under the District Court's reasoning, as I have noted, not only is that evidence not probative on the Board's lack of responsibility, it itself supports an inference of a constitutional violation. In addition, the District Court relied on a general proposition that "there is often a substantial reciprocal effect between the color of the school and the color of the neighborhood it serves" to block any inquiry into whether racially identifiable schools were the product of racially identifiable neighborhoods or whether past discriminatory acts bore a "but for" relationship to current segregative conditions.[24]

> "It is not now possible to isolate these factors and draw

---

[24] This empirical observation was not the product of evidence about Columbus, but general opinions expressed by two experts, Dr. Karl Taeuber and Martin Sloane; the latter testified on federal housing policy in the United States. As MR. JUSTICE POWELL has noted, experts have found that residential segregation exists " 'regardless of the character of

a picture of what Columbus schools or housing would have looked like today without the other's influence. *I do not believe that such an attempt is required.*

"I do not suggest that any reasonable action by the school authorities could have fully cured the evils of residential segregation. The Court could not and would not impose such a duty upon the defendants. I do believe, however, that the Columbus defendants could and should have acted to break the segregative snowball created by their interaction with housing. That is, they could and should have acted with an integrative rather than a segregative influence upon housing; they could and should have been cautious concerning the segregation influences that are exerted upon the schools by housing. They certainly should not have aggravated racial imbalance in the schools by their official actions." 429 F. Supp., at 259 (emphasis added).

But, as the District Court recognized, other factors play an important role in determining segregated residential patterns.

"Housing segregation has been caused in part by federal agencies which deal with financing of housing, local housing authorities, financing institutions, developers, landlords, personal preferences of blacks and whites, real estate brokers and salespersons, restrictive covenants,

---

local laws and policies, and regardless of the extent of other forms of segregation or discrimination.'" *Keyes* v. *School Dist. No. 1, Denver, Colo.*, 413 U. S., at 223 n. 9 (concurring in part and dissenting in part) (quoting Dr. Taeuber).

Dr. Taeuber credited residential segregation to economics, choice, and discrimination. In the latter category he included racially motivated site selection in public housing and urban renewal programs, restrictive covenants in housing deeds, lending policies of financial institutions, practices of the real estate industry, and zoning policies. Entering into all of this in some unspecified manner is the influence of school attendance zones. Testimony of Dr. Karl Taeuber, App. 280–311.

zoning and annexation, and income of blacks as compared to whites." *Ibid.*

The *Swann* Court cautioned that "[t]he elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage." 402 U. S., at 22. Yet today the School Board is called to task for all the forces beyond its control that shaped residential segregation in Columbus. There is thus no room for *Keyes* or *Swann* rebuttal either with respect to the school system today or that of 30 years ago.

IV

I do not suggest that the inquiry required by *Dayton I* and *Keyes* is a simple one, and reviewing courts must defer to the findings of district court judges. But appellate courts also must ensure that these judges are asking themselves the right questions: it is clear in the instant case that critical questions regarding causality and purpose were not asked at all. The city of Columbus has changed enormously in the last 25 years and with it the racial character of many neighborhoods. Incidents related here may have been paved over by years of private choice as well as undesirable influences beyond the control of school authorities, influences such as poverty and housing discrimination, both public and private. Expert testimony should play an important role in putting together the demographic history of a city and the role of a school board in it. I do not question that there were constitutional violations on the part of the Columbus School Board in the past, but there are no deterrence or retribution components of the rationale for a school desegregation remedy. The fundamental mission of such remedies is to restore those integrated educational opportunities that would now exist but for purposefully discriminatory school board conduct. Because critically important questions were neither asked nor answered

by the lower courts, the record before us simply cannot inform as to whether so sweeping a remedy as that imposed is justified.

At the beginning of this dissent, far too many pages ago, I suggested that the Court's opinion may only communicate a "hands-off" attitude in school desegregation cases and that my concerns should therefore be institutional rather than doctrinal. School desegregation cases, however, will certainly be with this Court as long as any of its current Members, and I doubt the Court can for long, like Pilate, wash its hands of disparate results in cases throughout the country.

It is most unfortunate that the Court chooses not to speak clearly today. *Dayton I* and *Keyes* are not overruled, yet their essential messages are ignored. The Court does not intimate that it has fathomed the full implications of the analysis it has sanctioned—an approach that would certainly make school desegregation litigation a "loaded game board," *Swann,* 402 U. S., at 28, but one at which a school board could never win. A school system's only hope of avoiding a judicial receivership would be a voluntary dismantling of its neighborhood school program. If that is the Court's intent today, it has indeed accepted the role of Judge Learned Hand's feared "Platonic Guardians," [25] and intellectual integrity—if not the Constitution or the interests of our beleaguered urban school systems and their students of all races—would be better served by discarding the pretextual distinction between *de facto* and *de jure* segregation. Whether the Court's result be reached by the approach of Pilate or Plato, I cannot subscribe to it.

---

[25] L. Hand, The Bill of Rights 73 (The Oliver Wendell Holmes Lectures, 1958):

"For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I knew how to choose them, which I assuredly do not. If they were in charge, I should miss the stimulus of living in a society where I have, at least theoretically, some part in the direction of public affairs."